**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE**

| |
|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, BUSINESS ROUNDTABLE, and TENNESSEE CHAMBER OF COMMERCE & INDUSTRY, <br><br> *Plaintiffs*, <br><br> v. <br><br> SECURITIES AND EXCHANGE COMMISSION and GARY GENSLER, in his official capacity as Chairman of the Securities and Exchange Commission, <br><br> *Defendants*. |

## COMPLAINT

Plaintiffs Chamber of Commerce of the United States of America, Business Roundtable, and Tennessee Chamber of Commerce & Industry, by and through undersigned counsel, bring this complaint for declaratory relief against Defendants Securities and Exchange Commission (Commission) and Gary Gensler, in his official capacity as Chairman of the Commission, alleging as follows:

## INTRODUCTION

1. Most shareholders of publicly traded companies exercise their right to vote on corporate governance matters through the use of proxies rather than by voting in person at shareholder meetings. Through "proxy solicitations"—*i.e.*, written communications explaining positions on issues—companies and other market participants seek to influence the outcome of shareholders' proxy voting. Among other things, the outcome of these shareholder votes can impact the composition of companies' boards of directors, executive pay, mergers and acquisitions, and how the companies approach hotly debated topics concerning environmental, social, and governance (ESG) issues.

2. Proxy voting advice businesses (PVABs) are ostensibly independent third-party firms that provide institutional investors and investment advisors with analysis and recommendations on how to vote their proxies on proposals made by a public company and/or its shareholders. In turn, these institutional investors and investment advisors use this information to vote, via proxy, on behalf of their clients—meaning PVAB voting recommendations play a critical role in determining the outcome of key corporate governance decisions. Many of these investors and those advising them do not even analyze PVAB recommendations for themselves. This is so because many PVAB clients use the PVABs' established default procedures whereby the PVABs automatically submit shareholder votes—so called "robo-votes"—in line with the PVABs' own recommendations, without any review by the clients.

-1-

3.     In the aggregate, PVAB voting recommendations have the ability to impact public markets as a whole, with the most recent data showing that, in 2020, institutional investors controlling over $5 trillion in assets voted in lock-step with PVAB voting recommendations. *See* Paul Rose, Manhattan Institute, *Proxy Advisors and Market Power: A Review of Institutional Investor Robovoting* (Apr. 22, 2021), *available at* http://www.manhattan-institute.org/proxy-advisors-market-power-review-investor-robovoting.

4.     In addition, with the rise of shareholder proposals on ESG issues, and with the Commission considering new rules mandating climate, diversity, and other ESG disclosures, PVABs are poised to become even more influential as existing and new clients rely on their advice regarding even more corporate governance decisions.

5.     The power of PVABs is magnified by the fact that the PVAB industry is effectively a duopoly, with just two firms, Institutional Shareholder Services (ISS) and Glass Lewis, providing 90% of all proxy voting recommendations in the United States each year.  As a result, the recommendations issued by these two companies often have the power to dictate the outcome of shareholder votes, and with them, some of the most important decisions facing public companies. Indeed, according to two economists who have studied the interplay of PVABs on capital markets, "[g]iven the centrality of proxy advice in corporate elections, it is not an exaggeration to say that the viability of shareholder democracy hinges on the effectiveness of proxy advice."  John G. Matsuaka and Chong Shu, Working Paper, *Does Proxy Advice Allow Funds to Cast Informed Votes?* (June 15, 2021).

6.     Despite this enormous influence, for decades the PVAB industry was largely free from regulatory oversight (unlike every other participant in the proxy voting process that disseminates information).  PVAB recommendations therefore stood in contrast to most federal

solicitations, which are subject to the federal proxy rules. Those rules impose information and filing requirements, including the obligation to file with the Commission and furnish to shareholders a definitive proxy statement containing numerous specified disclosures and to file all additional soliciting materials.

7.      In this absence of oversight, a number of troubling practices by PVABs developed. For example, it became common for PVABs to issue voting recommendations for the very same companies to which they provided separate corporate governance consulting services, tainting their recommendations with undisclosed conflicts of interest and disadvantaging the companies that chose not to purchase the PVABs' services. Perhaps even more concerning, PVAB recommendations were routinely predicated on inaccurate information or incomplete and misleading analysis. Because PVAB recommendations were often issued right before a proxy vote, companies that were the subjects of a PVAB's recommendations frequently were left without an opportunity to correct inaccurate information or flawed analysis and set the record straight. As a result, critical corporate and investor decision-making suffered.

8.      In light of these concerns, the Commission, using its authority under the Securities Exchange Act of 1934 to regulate PVABs, conducted a decade-long process, during which it reviewed the practices that had developed in the PVAB industry and solicited public input on the same. In September 2020, following a 60-day period of notice and comment, the Commission promulgated a rule imposing modest reforms designed to increase PVAB transparency and the accuracy of information contained in proxy voting recommendations. *See generally Exemptions from the Proxy Rules for Proxy Voting Advice*, 85 Fed. Reg. 55,082 (Sept. 3, 2020) (2020 Rule). Notably, the Commission's final rule included a number of substantive changes from the proposed rule, reflecting the Commission's careful consideration of the comments it had received.

9. The 2020 Rule made clear that proxy voting advice generally constitutes a solicitation subject to the federal proxy rules. Those rules impose information and filing requirements on entities soliciting a proxy, including the obligation to file with the Commission and furnish to shareholders a definitive proxy statement.

10. However, the 2020 Rule created exemptions that could be used by PVABs to avoid the federal proxy rules' disclosure and filing requirements. In order to be eligible for these exemptions, the 2020 Rule required that PVABs disclose potential conflicts of interest, provide companies on which they issue recommendations access to the PVAB's voting recommendations at the same time those recommendations are provided to the PVAB's clients, and notify their clients if the subject companies issued any response or fact correction to the PVAB's recommendation.

11. The 2020 Rule also confirmed that PVABs are subject to the proxy solicitation antifraud provisions, amending a note to SEC Rule 14a-9 to include as one example that "failure to disclose material information regarding proxy voting advice . . . such as the [PVAB's] methodology, sources of information, or conflicts of interest" may constitute a misstatement. 17 C.F.R. 240.14a-9 Note (e).

12. In conjunction with issuing the 2020 Rule, the Commission issued supplemental guidance addressing the prevalent robo-voting practice whereby PVABs automatically submit the votes of their clients without any further client review. *Supplement to Commission Guidance Regarding Proxy Voting Responsibilities of Investment Advisers*, 85 F.R. 55,155 (Sept. 3, 2020) (2020 Guidance). The 2020 Guidance recommended that an investment adviser consider disclosing (1) the extent to which, and circumstances under which, it uses robo-voting; and (2) how it addressed robo-voting where it became aware before the voting deadline that an issuer

intended to file or had filed additional soliciting materials with the Commission regarding a matter to be voted upon. *Id*. at 55,156. The Commission urged that such disclosures form part of an overall effort "to ensure that any policies and procedures with respect to automated voting of proxies, are reasonably designed to ensure that [an investment advisor] exercises voting authority in its client's best interest." *Id.*

13. In short, these modest, common-sense reforms were designed to ensure proper disclosure by PVABs and improve access to transparent, accurate, and complete information for proxy vote participants and the market as a whole, reinforcing a central tenet of the securities laws and one that should be uncontroversial.

14. The 2020 Rule gave PVABs until December 1, 2021 to set up compliant policies and procedures, providing ample time for these changes to be implemented after the 2021 proxy season (in the spring of 2021).

15. However, a mere nine months later, before the Rule *ever went into effect* and following the appointment of a new Commission Chairman by the new presidential administration—which created a 3-2 Democratic majority on the Commission—the agency abruptly and improperly changed course. On June 1, 2021, the agency made three announcements indicating its intention to abandon the existing requirements imposed by the 2020 Rule. First, the Commission directed its staff to consider modifications to the 2020 Rule. Second, the Commission announced that it would refuse to enforce the 2020 Rule against PVABs, effectively rescinding the Rule without any process whatsoever. Third, in a court filing, the Commission reiterated that PVABs would no longer be required to comply with the 2020 Rule's requirements. Each of those actions was taken without following the proper procedures under the Administrative Procedure Act (APA) as mandated by Congress.

5

16.     Two commissioners pointed out the irregularity of these actions, noting that "reopening large swathes of work that was just completed without new evidence to warrant reopening is not normal practice.  Past Commissions have generally refrained from engaging in a game of seesaw with our rulebook. . . . [These actions] undermine[] the Commission's reputation as a steady regulatory hand."  Hester M. Peirce & Elad L. Roisman, Commissioners, U.S. Sec. & Exch. Comm'n, *Moving Backward or Falling Back? Statement on Chair Gensler's Regulatory Agenda* (June 14, 2021), *available at* https://www.sec.gov/news/public-statement/moving-forward-or-falling-back-statement-chair-genslers-regulatory-agenda.

17.     Ten days after the Commission's announcements, on June 11, 2021, the Commission's staff held a closed-door meeting exclusively with large institutional investors who were opposed to the 2020 Rule.  *See* 17 C.F.R. 240 n.24.  Many of the attendees, such as the AFL-CIO and the New York Comptroller, are well-known allies to the current administration.

18.     Supporters of the 2020 Rule were not invited to this meeting, nor were they invited to attend a separate meeting with the Commission staff.  The Commission not only failed to disclose any transcript or minutes of what was discussed at this private meeting on its own initiative, but, to date, it has also failed to release such records in response to a FOIA request made by Plaintiff United States Chamber of Commerce on February 1, 2022.

19.     Thereafter, on November 26, 2021, in a 3-2 party-line vote that was foreshadowed by the Commission's prior coordinated action, the Commission issued a proposed amended rule to replace the 2020 Rule.  *See Proxy Voting Advice*, 86 Fed. Reg. 67,383 (Nov. 26, 2021) (Proposed Amended Rule).  The Proposed Amended Rule rescinded the requirements that a PVAB make its recommendations available to a company that is a subject of the PVAB's voting advice at least simultaneous with when those analyses are sent to the PVAB's clients and provide a means by

which those clients can be informed of the company's responses.  In addition, the Proposed Amended Rule also removed the Note (e) example explaining that certain omissions in proxy voting recommendations could constitute a misstatement under federal securities regulations.  The Proposed Amended Rule thereby undid the key protections set forth in the 2020 Rule to ensure that shareholders have access to robust and complete information regarding their voting decisions

20.     The Commission's Notice of Proposed Rulemaking was followed by, in the words of leaders of the U.S. Senate Banking Committee and U.S. House of Representatives Financial Services Committee, an "unreasonably short" 30-day public comment period (as opposed to the 60-day public comment period for the 2020 Rule) that also fell over the year-end holidays.  Letter from Senator Pat Toomey & Representative Patrick McHenry to Chairman Gary Gensler (Jan. 10, 2022) at 1, 2 n.4, *available at* https://republicans-financialservices.house.gov/uploadedfiles/2022-01-10_pmc_toomey_letter-gensler_sec_comment_period.pdf.  Requests from the public for an extension of the time to comment were ignored, further signaling that the Commission had predetermined that it would abandon the 2020 Rule and was not interested in public input.[1]

21.     Unsurprisingly, on July 19, 2022, in another party-line vote, the Commission codified the Proposed Amended Rule without any changes.  *See Proxy Voting Advice*, 87 Fed. Reg. 43,168 (July 19, 2022) (Amended Rule).  The Amended Rule also rescinded the 2020 Guidance on robo-voting.  *Id.* at 43,178.  These changes in position could not be justified by the administrative record before the Commission or any new information the Commission cited since its adoption of the 2020 Rule.  As Commissioner Peirce, one of the dissenting members of the Commission, had explained, "the weight of the comments received . . . favor[ed] the Commission

---

[1]  *See, e.g.*, U.S. Chamber of Commerce's Center for Capital Markets Competitiveness, Letter to SEC on Proxy Voting Advice Amendments (November 30, 2021); American Securities Association, Letter to SEC on Proxy Voting Advice Amendments (December 3, 2021).

leaving intact its 2020 work." Hester M. Peirce, Commissioner, U.S. Sec. & Exch. Comm'n, *U-Turn: Comments on Proxy Voting Advice* (July 13, 2022), https://www.sec.gov/news/statement/peirce-statement-proxy-voting-advice-071322. And those commenters favoring the retention of the 2020 Rule had identified "serious flaws in the Commission's stated rationale" for the Proposed Amended Rule. *Id.*

22.     The political nature of the Commission's actions was obvious: the Commission had found "a way to redo a freshly adopted rule without any new information to suggest such a rewrite [was] warranted." *Id.* Commissioner Peirce concluded that "[c]hanging course so dramatically with so little justification does not bode well . . . . What credibility will we have as an independent agency if our regulations so drastically swerve from one year to the next? If we keep making U-turns like this one, people might start to wonder whether the GPS we are using is calibrated to respond to political rather than market signals." *Id.*

23.     The current Commission's move away from transparency, accuracy, and shareholder access to information is particularly notable given its efforts to promote such interests in other areas, such as ESG. Indeed, concurrent with the Commission's announcement that it would not require PVABs to comply with the 2020 Rule and its holding of the secretive session with opponents of the regulation, Chairman Gensler gave a speech in which he stated that he "asked SEC staff to develop a mandatory climate risk disclosure rule proposal" and claimed that disclosure will bring "needed transparency to our capital markets" and that such transparency is at "the heart of the SEC's mission to protect investors, maintain fair, orderly, and efficient markets, and facilitate capital formation." Gary Gensler, Chairman, U.S. Sec. & Exch. Comm'n, *Prepared Remarks Before the Principles for Responsible Investment Climate and Global Financial Markets Webinar* (July 28, 2021), *available at* https://www.sec.gov/news/speech/gensler-pri-2021-07-28.

24.     As Chairman Gensler has recognized in other contexts, transparency and information disclosure promote the integrity of the stock market. For this reason, the Commission spent a decade crafting the 2020 Rule to ensure greater transparency regarding regulated parties and greater access of information for shareholders. Under the 2020 Rule, when a PVAB tells investors how to vote on a proposal, the company that is the subject of that advice has an opportunity to respond in a timely manner if it believes that the recommendation is inaccurate or incomplete. That is a good thing: it helps ensure that proxy votes are based on accurate information and police when PVABs are favoring certain shareholders over others. The Commission has frequently argued that companies should be required to disclose more information in the name of transparency and other objectives. Here, however, after a closed-door meeting with opponents of the 2020 Rule, the new majority on the Commission decided to deputize PVABs as the gatekeepers of information for both companies and shareholders. In doing so, the Commission's majority has made a mockery of administrative procedure by wiping away recent, measured reforms on an incredibly rushed basis, without a meaningful opportunity for public comments, and on the basis of nothing new. That is exactly what the APA does not allow, as the Supreme Court and lower courts have time and again confirmed.

25.     The Amended Rule violates the Commission's obligations under the APA, 5 U.S.C. § 500, *et seq.*, in numerous ways.

26.     To begin, the Commission violated the APA by not affording interested parties a meaningful opportunity to comment on the Proposed Amended Rule because of the unduly truncated public comment period.

27.     The Commission also failed to engage in reasoned decision-making. The Commission's two purported justifications for the amendment are riddled with flaws and logical

inconsistencies, no doubt due to the rushed and biased process that led to the Amended Rule. The Commission now claims in conclusory fashion that the 2020 Rule would have adverse effects on the cost, independence, and timeliness of PVABs' voting recommendations and create an increased litigation risk for PVABs—despite having considered and rejected these exact same purported concerns just months before in the 2020 rulemaking and without explaining *how* the 2020 Rule could have had such effects. The Commission provides no evidence of new or changed circumstances to justify this about-face. The Commission also argues that the rule is now unnecessary due to industry self-regulation by PVABs, even though the Commission previously recognized that those voluntary standards are not comprehensive, complete, or uniformly followed, and PVABs could choose to change their compliance with these industry standards at any time (as one of the two largest PVABs has already done). In fact, the limited self-regulatory measures implemented to date were imposed directly in response to the now-rescinded rule, calling their continued viability into question. Given the Amended Rule's contradiction of factual findings underlying the 2020 Rule, as well as the Amended Rule's impact on serious reliance interests, the Commission was required under the APA to provide enhanced justifications for reversing its position. It has utterly failed to do so.

28.     In addition to this failure to engage in reasoned rulemaking, the Amended Rule's cost-benefit analysis is opportunistically framed, focusing on benefits to PVABs' profitability while ignoring the substantial costs to companies and investors, in violation of the APA and the Securities Exchange Act of 1934. And the Commission also violated the APA by failing to consider reasonable alternative proposals, by downplaying or ignoring important aspects of the problems leading to the 2020 Rule (specifically the ongoing factual and analytical errors in PVAB recommendations despite supposedly curative industry self-regulation), and by deferring to

PVABs' self-regulation, thereby giving them preferential treatment compared to other regulated parties for which the Commission has concluded self-regulation is insufficient.

29.     Unsupported by the extensive administrative record (which was primarily developed during the rulemaking process for the 2020 Rule), the Amended Rule is plainly the by-product of political objectives.  But a change in the political winds does not excuse the Commission from its obligation to engage in rational rulemaking via the APA-required process.  Because such reasoned decision making did not happen here, this Court should declare the Amended Rule unlawful, enjoin the SEC's implementation of it, and order the SEC to reinstate and enforce the 2020 Rule.

## PARTIES

30.     Plaintiff Chamber of Commerce of the United States of America (U.S. Chamber) is the world's largest business federation, with over 300,000 members, some of which are also members of the Tennessee Chamber.  A 501(c)(6) nonprofit headquartered in Washington, D.C., the U.S. Chamber represents the interests of its members nationwide, who, in turn, represent a wide array of industry sectors and every region of the country, as part of its overall mission to advocate for policies designed to help businesses create jobs and grow the national economy.  The U.S. Chamber has members that are registrants with the SEC, have publicly traded shares, are covered by PVABs, and are adversely affected by the Amended Rule.

31.     Plaintiff Business Roundtable is a 501(c)(6) non-profit association of chief executive officers of America's leading companies.  These companies employ over 20 million employees across the country, with employees in every state, including Tennessee, and have a total value of over $20 trillion, which accounts for half the value of all publicly traded companies in the United States.  The Business Roundtable works to promote a thriving United States economy and economic opportunity for all Americans by advocating for sound public policies.  The Business

Roundtable is headquartered in Washington, D.C.  The members of the Business Roundtable are CEOs of companies that are registrants with the SEC, have publicly traded shares, are covered by PVABs, and are adversely affected by the Amended Rule.

32.     To further their overall purposes, the U.S. Chamber and the Business Roundtable have challenged rulemaking by federal agencies, including the Commission, when that rulemaking violates the law.  *See, e.g.*, *Chamber of Commerce* v. *U.S. Dep't Health & Human Servs.*, 21-cv-309 (E.D. Tex. 2021); *Business Roundtable* v. *SEC*, 10-1305 (D.C. Cir. 2011); *Chamber of Commerce* v. *SEC*, 04-1300 (D.C. Cir. 2005); *Business Roundtable* v. *SEC*, 88–1651 (D.C. Cir. 1990).

33.     Plaintiff Tennessee Chamber of Commerce & Industry (Tennessee Chamber) is the premier business association in the state of Tennessee, representing member businesses and serving as the primary voice of diverse business and manufacturing trade interests in Tennessee. The 501(c)(6) nonprofit is headquartered in Nashville, Tennessee.  The Tennessee Chamber has members that are registrants with the SEC, have publicly traded shares, are covered by PVABs, and are adversely affected by the Amended Rule.  Among other things, the Tennessee Chamber seeks to vindicate the legal and economic interests of its members.

34.     Plaintiffs bring this action on behalf of their members in order to advance the interests of their members as well as the interests of the entire business community.  As part of their commitments to advocating for their members, Plaintiffs are deeply devoted to ensuring the conveyance of fair and accurate information to shareholders so as to inform shareholder decision making in the best interests of public companies.

35.     Notably, the Amended Rule's removal of the 2020 Rule's key notice and response provisions will often deprive Plaintiffs' members of the opportunity to review PVAB proxy voting

recommendations about their businesses in a timely manner, and have the PVABs notify their clients of any of the companies' corrections to inaccurate information in those recommendations prior to the shareholder vote. This results in proxy voting decisions being made based on inaccurate information or faulty analysis, which harms member companies, their investors, and capital markets as a whole.

36. PVABs have on countless occasions rendered materially inaccurate information about Plaintiffs' members as part of disseminating proxy advice, *see infra* Part B.1. These inaccuracies have forced Plaintiffs' members to file expensive and time-consuming supplemental proxy statements in response, statements that are not guaranteed to reach shareholders prior to the vote in question. The 2020 Rule would have substantially decreased the costs of correcting misleading proxy recommendations and would have helped ensure that companies can get information out to their shareholders in an effective and timely manner before a vote occurs.

37. Additionally, under the Amended Rule, even in the rare case where a member has time to review and respond to incorrect or incomplete information in PVAB recommendations before a shareholder vote, the member's only recourse is to file supplemental proxy materials with the Commission pointing out and correcting the errors in the PVAB recommendations. If the investors do not know about or access these supplemental disclosures—as opposed to being notified by the PVAB of an update from the company, which is a much more effective way to ensure that they are aware of the additional information responding to the PVAB recommendation—then they will almost certainly cast their proxy votes based on faulty and/or incomplete information.

38. The removal of Note (e) to Rule 14a-9 also adversely affects Plaintiffs and their members. Rule 14a-9(a) prohibits false or misleading statements or omissions of material facts in

proxy solicitations, which includes proxy voting advice. In the 2020 Rule, Note (e) provided an "example[] of what, depending upon particular facts and circumstances, may be misleading" under Rule 14a-9, namely, a PVAB's "failure to disclose . . . [its] methodology, sources of information, or conflicts of interest." With the rescission of Note (e) in the Amended Rule, U.S. Chamber, Business Roundtable, and Tennessee Chamber members and the public at large will no longer be able to rely on this example to hold PVABs legally accountable for this type of omission or misleading statement under Rule 14a-9. Plaintiffs believe that without Note (e) the ability to deter improper PVAB actions is notably lessened and thus they could be harmed. The rescission of Note (e) has also created substantial uncertainty about the application of Rule 14a-9. Namely, if the deletion is not a substantive change to Rule 14a-9, why was this modification needed? This regulatory uncertainty has also harmed Plaintiffs and their members.

39. For all of these reasons, the U.S. Chamber and Business Roundtable, as well as many of their members, strongly advocated for the 2020 Proxy Advice Rules and, in the short amount of time allotted, opposed the Amended Rule. *See, e.g.*, Comment of the Chamber of Commerce of the United States of America, File No. S7-17-21; Comment of the Business Roundtable, File No. S7-17-21.

40. Defendant SEC is a federal government agency charged with securities regulation. It is subject to the APA pursuant to 5 U.S.C. § 551(1).

41. Defendant Gary Gensler is the Chairman of the Commission. He is sued in his official capacity and is also subject to the APA pursuant to 5 U.S.C. § 551(1).

## JURISDICTION AND VENUE

42. Plaintiffs bring this action under the APA, 5 U.S.C. § 500 *et seq.*, and therefore this Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

43.     Plaintiffs also have associational standing to bring this suit on behalf of their various members.  Their members are directly and adversely affected by the Amended Rule and accordingly have standing to sue in their own right.  The interests Plaintiffs seek to protect are germane to their purposes, and neither the claim asserted nor the relief requested requires an individual member to participate in the suit.  *See, e.g.*, *Chesapeake Climate Action Network* v. *EPA*, 952 F.3d 310, 318 (D.C. Cir. 2020); *see also Hunt* v. *Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

44.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) because it is an action against an agency and officer of the United States, and no real property is involved.

## FACTUAL BACKGROUND

### A.     Proxy Voting and PVABs

45.     Public companies grant their shareholders the right to participate in important issues of corporate governance.  This decision-making power includes critical issues such as the election of directors, the right to issue dividends, and the approval of mergers and acquisitions.  But the reality is that the majority of these votes are cast not by the shareholders themselves, but via institutions (like pension funds) and investment advisors that pool the shareholders' stock and vote on their behalves through proxies.  *See* 2020 Rule at 55,083.

46.     Indeed, as the Commission noted in 2020, "proxies have become the predominant means by which shareholders of publicly traded companies exercise their right to vote on corporate matters."  2020 Rule at 55,083.   According to the Commission, proxy voting advice is "widely used," "typically delivered shortly before the shareholder meeting," and "often an important factor in shareholder voting decisions that can sway outcomes."  *ISS* v. *SEC*, No. 19-cv-3275 (D.D.C. Oct. 30, 2020), Dkt. 35-1 (Motion for Summary Judgment) at 2.

47. PVABs operate by issuing proxy voting advice to the institutional investors and investment advisors who together control the votes of more than 70% of the outstanding shares in U.S. public companies. PVABs provide proxy voting recommendations for thousands of shareholder meetings each year, across nearly every industry.

48. As noted above, ISS and Glass Lewis effectively form a duopoly in the PVAB industry, and so often have the power to dictate the outcome of shareholder votes, and with them, some of the most important decisions facing public companies. The already outsized influence of PVABs has been further strengthened by the use of electronic voting practices such as robo-voting. PVABs have implemented such default procedures whereby they directly implement their proxy recommendations by automatically submitting the votes of their clients without any review from those clients. *See* Timothy M. Doyle, *The Realities of Robo-Voting*, Am. Council for Capital Formation (Nov. 2018). Robo-voting is a problematic practice that eliminates any opportunity for proxies to meaningfully participate in the voting process.

49. These issues are exacerbated when PVAB recommendations are based on inaccurate information. And recent studies have shown that robo-voting has a firm grip within the proxy voting space. *See* Paul Rose, Manhattan Institute, *Proxy Advisors and Market Power: A Review of Institutional Investor Robovoting* (Apr. 22, 2021) (explaining how over 100 institutional investors with over $5 trillion in assets in 2020 voted in lockstep with the dominant PVABs' recommendations through robo-voting).

50. Accordingly, as the Commission recognized in 2020, "[PVABs] have become uniquely situated in today's market to influence, and in many cases directly execute," investors' voting decisions. 2020 Rule at 55,083.

51.     Moreover, as shareholder proposals regarding ESG become more prolific, the influence of PVABs can only be expected to grow.

52.     PVABs thus play a critical role in capital markets.  And yet, until recently, in stark contrast to all other actors who disseminate information as part of the proxy process, PVABs were largely unregulated.  In the absence of proper oversight, PVAB voting recommendations became plagued by troubling practices, including rampant conflicts of interest, recommendations premised on inaccurate information or faulty analysis, and "one-size-fits-all" voting advice that failed to take into account the unique position of certain corporations or investors.

### B.     PVABs' Conflicts of Interest and Inaccurate Reports

53.     PVABs' immense influence on public markets became an area of concern to the Commission as early as 2004, and that concern accelerated over the years given the growing evidence that PVAB voting recommendations were often compromised by inaccurate or incomplete information and conflicts of interest.  Indeed, it was these dangers that the Commission originally sought to address in the 2020 Rule.  *See Amendments to Exemptions from the Proxy Rules for Proxy Voting Release* 84 Fed. Reg. 66,518 (Dec. 4, 2019) (Proposed 2020 Rule) at 66,520 (noting that the rulemaking was "focused on the accuracy and soundness of the information and methodologies used to formulate proxy voting advice businesses' recommendations as well as potential conflicts of interest that may affect those recommendations").

### 1.     Inaccurate Information and Analysis

54.     Proxy voting recommendations premised on erroneous information or faulty analysis cannot be trusted to provide accurate advice to proxy voters.  Yet it is often a reality of PVAB voting recommendations.

55.     For example, the American Council for Capital Formation (ACCF) found that, during the 2020 proxy season, businesses were forced to file supplemental proxy materials with

the Commission to dispute or correct errors contained in reports issued by PVABs on at least 42 occasions. *See* American Council for Capital Formation, *Are Proxy Advisors Still a Problem: 2020 Proxy Season Analysis Shows Companies Believe Errors Continue* (July 2020). Several of these instances involved Plaintiffs' members.

56. Some of these instances include:

a) An energy infrastructure company filed a supplemental filing to dispute the recommendation of two PVABs to vote against the company's say-on-pay proposal, noting that the analysis on this issue was based on a wildly incorrect net income figure that was off by a factor of 6.2x, or $1.7 billion. *Id.* at 5. Adding insult to injury, this was the second year that one of the PVABs had used a disputed figure as the basis for its recommendation, even though the company had previously identified this issue to the PVAB. *Id.*

b) A software company filed a supplemental filing after a PVAB issued a "withhold" recommendation against one of its directors, claiming that the director violated the PVAB's best-practice standards limiting a director to membership on at most three public audit committees, unless the director is a retired CPA, CFO, controller, or has similar experience. But the director at issue *was* a retired finance professional, and, accordingly, the PVAB's recommendation was wrongly applied. *Id.*

c) A precious metals mining company filed a supplemental filing challenging a PVAB recommendation that relied on a faulty peer group selection on a say-on-pay proposal, pointing out that the PVAB used a peer group of only U.S. businesses, including those in the chemical and agricultural products sector, instead of the more appropriate Canadian mining businesses that dominate the industry. *Id.*

d) A business development company filed a supplemental filing disputing a PVAB's reporting of one board member's attendance at board meetings, noting that the director had attended *all* regularly scheduled meetings and only missed meetings scheduled without notice. *Id.* at Appendix at 9.

e) A restaurant and entertainment business filed a supplemental filing to dispute a PVAB's recommendation to vote against the company's proposal to increase shares eligible under its omnibus incentive plan. The company pointed out that the PVAB relied on a pre-COVID calculation of its share price in formulating its recommendation. *Id.*

f) A global technology company filed a supplemental filing disputing a PVAB report that claimed that the company failed to disclose minimum vesting periods for stock options. The company noted that this disclosure was explicitly made in its proxy statement. *Id.*

g) An investment banking advisory firm filed a supplemental filing to identify a number of analytical errors and an omission in a PVAB recommendation against its proposed equity incentive plan amendments. It pointed out that the PVAB's quantitative analysis was faulty given that it excluded from its burn-rate and dilution analyses the anti-dilutive impact of the share repurchase, and the recommendation compared the company's equity compensation practices to a purported "peer group" that had materially different capital structures and business models. *Id.*

h) A special purpose acquisition company filed a supplemental filing to correct a misstatement about its proposed amendment plan contained in the PVAB's voting

recommendation. If the plan was approved, the company clarified, insiders or their affiliates must deposit $.15 for each share of unredeemed common stock—which the PVAB incorrectly reported as being limited to only an aggregate amount of $500,000.

i) A power electronics company filed a supplemental filing disputing a PVAB's finding that the company's 2014 equity plan was "cost excessive," pointing out that the PVAB used an incorrect performance measurement period and failed to note that the earnings per share had continued to grow despite an increase in outstanding shares. *Id.*

j) An urban office real estate investment trust filed a supplemental filing pointing out a serious omission in a PVAB's recommendation against board members. The PVAB recommendation was based on non-compliance with its policy preference on bylaws related to shareholders' rights to amend bylaws—but this policy preference is contrary to Maryland law, which governs the company. *Id.*

k) An energy company filed a supplemental filing disputing a PVAB's negative vote recommendation based in part on what it called the company's "problematic practice" of granting executive age credits for the company pension plan. But the company noted that it had no plans to grant age credits as a practice. *Id.*

57. This problem *worsened* in the 2021 proxy season, as the ACCF identified at least 50 instances where proxy advisors formulated recommendations based on inaccurate or incomplete data or analysis. *See* American Council for Capital Formation, *Proxy Advisors Are Still a Problem: 2021 Proxy Season Analysis Shows Companies Continue To Report Similar Rate of Errors Despite Heightened Scrutiny* (Dec. 2021). Again, several of these instances involved Plaintiffs' members.

58.     Some of these instances include:

a) A biosciences company filed a supplemental filing disputing a PVAB recommendation to vote against a slate of directors due to concerns about the nominees' meeting attendance. But, as the company noted, the board members at issue had near perfect attendance. *Id.* at 10.

b) An IT services and professional solutions company filed a supplemental filing challenging a PVAB recommendation to vote against a director due to her status as a "non-independent member of the audit and compensation committees." However, the director in question was *not* a voting member of either committee, but rather served only as a non-voting advisor. *Id.*

c) A vehicle control systems company filed a supplemental filing disputing a PVAB recommendation against a board member that relied on a factually incorrect designation that the board member voluntarily resigned—when the board member had in actuality been terminated by the company. This impacted the severance pay afforded to the board member, which the company noted is consistent with all executive officers in which termination is initiated by the company and was contrary to the PVAB's justification. *Id.*

d) A metals recycling industry company filed a supplemental filing pointing out issues with a PVAB recommendation to vote against its say-on-pay proposal, noting that the PVAB failed to take into account the COVID-19 pandemic when comparing the company's shareholder return against its peer set because the company used a different fiscal year period than its peers. If taken into account, its total shareholder performance would have been in the 65th percentile, not the 33rd percentile. *Id*.

e)  A commercial real estate firm filed a supplemental filing disputing a PVAB recommendation against the election of a director, on the rationale that no director who is a CEO of a company should also serve on more than two additional public company boards.  However, the PVAB recommendation failed to take into account that the additional boards at issue were all affiliates of the parent company, meaning that all of his duties were still within the same organization.  *Id.* at 11.

f)  A manufacturing company filed a supplemental filing disputing a PVAB recommendation to vote against three board directors, claiming that the board members earned benefits due to a recent company acquisition, a fact the supplemental filing claimed never occurred.  *Id.*

g)  A tank barge operator filed a supplemental filing disagreeing with a PVAB recommendation to vote against the employee equity plan, noting the PVAB used a flawed, overstated cost plan and a wrong evaluation of the plan timeline.  *Id.* at Appendix at 14.

h)  A software company filed a supplemental filing disputing a PVAB recommendation to vote against its new stock incentive plan, noting that the recommendation overstated the plan's total cost.  *Id.*

i)  A telecommunications company filed a supplemental filing disputing a PVAB recommendation to vote against shareholder proposals on annual equity awards and an amendment to the company's clawback policy.  The company noted that the PVAB used an inaccurate peer benchmark and also mischaracterized its current clawback policies and equity awards.  *Id.* at 15.

j) A real estate investment trust filed a supplemental filing disputing a PVAB recommendation to vote against its say-on-pay proposal, noting that the methodology used by the PVAB failed to take into account that the company was in "the middle of global health crisis which ha[d] severely impacted the lodging and hospitality industry." *Id.*

k) An insurance company disputed a PVAB recommendation against the chair of its audit committee, which claimed that the audit committee held only one formal meeting in 2020. The company noted that the recommendation failed to account for the fact that the company bylaws prohibit participation in meetings from the United States, and, due to the COVID-19 pandemic, board members could not travel to Bermuda as required. Furthermore, the board conducted virtual meetings throughout the year. *Id.*

l) A financial services holding company filed a supplemental filing disputing a PVAB recommendation against its proposed merger with another company, noting that its detailed analysis supports the merger, and that this information had been provided to ISS. *Id.*

59. The ACCF's statistics actually understate the problem because they do not capture companies that were unable to access or respond to PVAB recommendations prior to the vote in question, which, as the Commission recognized in 2020, is a frequent occurrence. *See* Proposed 2020 Rule at 66,530 (explaining how many proxy votes are cast "within a few days or less of the [PVAB's] release of its proxy voting advice" or through automated voting processes such as robo-voting, rendering companies unable to respond in time to correct factual or methodological errors in the recommendations). Surveys of CEOs conducted by Plaintiff Business Roundtable in 2013

and 2018, for example, revealed that nearly every single one of the respondents had "found one or more factual errors in reports prepared by proxy advisory firms," and that, "while 90 percent of companies notify the proxy advisory firms of the errors, only 8 percent of companies find that those errors are consistently corrected." Business Roundtable, *Letter to SEC Chairman White on Proxy Advisory Firms* (September 12, 2013), *available at* https://www.businessroundtable.org/archive/resources/letter-tochairman-white-on-proxy-advisory-firm.

### 2. Conflicts of Interest

60. The Commission also correctly recognized, in 2020, that the PVAB business model itself often creates dangerous conflicts of interests, noting that "[PVABs] engage in activities or have relationships that could affect the objectivity or reliability of their advice, which may need to be disclosed in order for their clients to assess the impact and materiality of any actual or potential conflicts of interest with respect to a voting recommendation." Proposed 2020 Rule at 66,525.

61. These conflicts of interest take different forms, but one of the most prominent is that PVABs provide voting advice on companies to institutional investor and financial advisor clients, while at the same time earning fees from these same companies for consulting on corporate governance policies.

62. In a similar vein, PVABs also issue ratings regarding companies' corporate governance practices—while, again, at the same time offering consulting services for companies to help increase their corporate governance scores.

63. PVABs also issue recommendations and ratings concerning companies that have declined to purchase the PVABs' corporate governance consulting services.

64. Finally, PVABs also have offered voting advice on matters in which their affiliates or one of their clients has a material interest, such as a business transaction or a shareholder

proposal put forward by that client, or other conflicts such as holding a significant ownership interest in a company or sitting on a company's board of directors.

65. The conclusion that improper and undisclosed conflicts of interest often taint PVAB voting recommendations has not just been recognized by the Commission but also by other governmental agencies and through independent quantitative research. *See, e.g.*, U.S. Gov't Accountability Off., GAO-07-765, *Corporate Shareholder Meetings: Issues Relating to Firms that Advise Institutional Investors on Proxy Voting* at 4 (2007); Tao Li, *Outsourcing Corporate Governance: Conflicts of Interest Within the Proxy Advisory Industry*, 64 Management Sci. 2473 (2016).

66. For example, in July 2021, a research study concluded that PVABs issue recommendations that are often distorted in order to advance the agenda of certain activist shareholders—which can come at the expense of the best economic interests of all shareholders. John G. Matsuaka and Chong Shu, *Does Proxy Advice Allow Funds to Cast Informed Votes?* (July 31, 2021). In examining the votes cast by 155 mutual fund families on six million corporate voting items between 2004-2017, the researchers concluded that the "ISS advice led funds to shift their votes in the opposite direction as information acquisition [by the fund itself via Edgar] on eight of 10 issues, suggesting the ISS recommendations distorted voting." *Id.* at 2. The researchers hypothesized that PVABs have aligned their recommendations with the preferences of socially responsible investment (SRI) funds, because such a move "can be a profit-maximizing strategy for [PVABs] if SRI funds place a high value on voting recommendations." *Id.* at 26. Such an alignment is lucrative for PVABs given that they stand to obtain more repeat business from large SRI funds who care a great deal about the valence of the recommendations.

67.     Furthermore, the ability of the PVABs to make proxy recommendations as to companies that also pay the PVABs for corporate governance work threatens those companies that do not hire the PVABs for corporate governance advice and thus risk less favorable PVAB recommendation on the companies' positions in proxy votes.

### C.     The Rulemaking Process for the 2020 Rule

68.     In light of these concerns, the Commission spent years—across presidential administrations of different political parties—closely examining the risks to publicly traded companies and the investor public before issuing the 2020 Rule.  For example, in 2010, the Commission issued a "proxy plumbing" concept release during which it sought public comment regarding "the role and legal status of proxy advisory firms within the U.S. proxy system"; in 2013, it held a roundtable to solicit input on the use of proxy advice by institutional investors and investment advisers; in 2014, it released a Staff Legal Bulletin to "provide guidance about the availability and requirements of two exemptions to the federal proxy rules that are often relied upon by proxy advisory firms"; and, in 2018, it held another roundtable seeking "input on questions that arise regarding the use of proxy advisory firms and their activities."  *See* Release No. 34–86721, *Commission Interpretation and Guidance Regarding the Applicability of the Proxy Rules to Proxy Voting Advice*, 84 Fed. Reg. 47,416 (Sept. 10, 2019).

69.     The Commission's review culminated in 2019, when the Commission determined that a formal rulemaking was necessary and issued a Proposed Notice of Rulemaking providing for a comment period of 60 days.  *See generally* Proposed 2020 Rule.  What followed was robust engagement with public opinion.  Notably, during the 60-day comment period, 650 comments were submitted, and the Commission staff engaged in 80 reported meetings with interested parties.

### D.     The Final 2020 Rule

70.     On September 3, 2020, the final 2020 Rule was formally issued.  *See generally* 2020 Rule.  The 2020 Rule included substantial revisions to the 2019 version of the proposed rule in response to input submitted through the comment process.  On the whole, the 2020 Rule made significant concessions to PVABs to afford them greater flexibility than originally contemplated by the Commission.  Thus, the 2020 Rule reflected a compromise position by adopting modest, principles-based reforms rather than prescriptive rules applicable to PVABs.

71.      The 2020 Rule amended SEC Rule 14a to clarify that proxy voting advice issued by PVABs constitutes a solicitation subject to the federal proxy rules.  However, the 2020 Rule also adopted Rule 14a-2(b)(9), which created an exemption that PVABs could use to avoid the federal proxy rules' disclosure and filing requirements if they met certain conditions.

72.     The first condition required that PVABs disclose in their proxy voting advice (or in the electronic medium used to deliver the proxy voting advice) a statement of any potential conflicts of interests "that [are] material to assessing the objectivity of the proxy voting advice" to their clients.  Rule 14a-2(b)(9)(i)(A).

73.     The second condition required that PVABs make their voting advice available to the companies that are the subject of that advice at or prior to the time the PVABs provide it to their clients (a change from the 2019 version of the proposed rule, which would have required PVABs to provide their recommendations in draft form to the subject companies for review prior to distributing the advice to PVABs' clients) and also required that PVABs alert their clients to any written response from the company in a timely manner prior to the shareholder vote (a change from the 2019 version of the proposed rule, which would have required PVABs to include the company's written response or a link thereto in the PVABs' recommendations).  Rule 14a-2(b)(9)(ii).

74.     In the words of the Commission, these two conditions were "fashioned both to elicit adequate disclosure and to enable [PVABs'] clients to have reasonable and timely access to transparent, accurate, and complete information material to matters presented for a vote." 2020 Rule at 55,085; *see* Cross-Mot. for S.J., *ISS* v. *SEC*, No. 19-cv-3275, Dkt. 35-1 at 2 (D.D.C. Oct. 30, 2020) (Commission statement that the conditions "help ensure that investors who use proxy voting advice have access to more transparent, accurate, and complete information, as well as the kind of robust discussion that would occur if all parties attended a shareholder meeting in person").

75.     The 2020 Rule also confirmed that PVABs are subject to the antifraud provisions that govern all proxy solicitations. To this end, the Commission amended the note to Rule 14a-9, which provides examples of what may constitute misleading statements under the statute, to include the example that the "failure to disclose material information regarding proxy voting advice . . . such as the [PVAB's] methodology, sources of information, or conflicts of interest" may constitute such a misstatement. 17 C.F.R. 240.14a-9 Note (e). The Commission further clarified that examples such as in Note (e) are "illustrative only, and are not intended to be exhaustive or absolute." 2020 Rule at 55, 121.

76.     Finally, as noted above, along with the 2020 Rule, the Commission issued the 2020 Guidance to address robo-voting. This guidance recommended that an investment advisor consider disclosing its policies and procedures surrounding automated voting so as to ensure, among other things, that clients understood how these systems could be updated to reflect subject companies' responses to and corrections of PVAB recommendations. Specifically, the Commission urged each advisor to consider disclosing (1) the extent of, and circumstances under which, it used automated voting; and (2) how it addressed automated voting where it became aware before the voting deadline that an issuer intended to file or had filed additional soliciting materials

with the Commission regarding a matter to be voted upon. 2020 Guidance. The Commission further explained that such disclosures "may be necessary" to ensure "that a client is able to understand the role of automated voting in the investment adviser's exercise of voting authority." *Id.*

78. The 2020 Rule generously provided PVABs with over a year—until December 1, 2021—to develop policies and procedures to comply with the Rule's requirements.

78. However, the PVAB industry refused to accept even these modest reforms, and the largest PVAB, ISS, sued the Commission to set aside the 2020 Rule. *See Institutional Shareholder Services Inc.* v. *SEC*, No. 19-cv-3275 (D.D.C.).

**E.   The Commission's Refusal to Enforce the 2020 Rule**

79. On April 17, 2021, Chairman Gensler was sworn in as the new Chairman of the Commission, thus creating a majority of Democratic Commissioners at the Commission. The Commission then abruptly flip-flopped on the 2020 Rule.

80. On June 1, 2021, the Commission took three highly unusual and coordinated actions. First, Chairman Gensler issued a formal statement to the Commission's staff directing them to reconsider the 2020 Rule. Gary Gensler, SEC Chairman, *Statement on the Application of the Proxy Rules to Proxy Voting Advice* (June 1, 2021), *available at* https://www.sec.gov/news/public-statement/gensler-proxy-2021-06-01. With the compliance date for the new requirements of the 2020 Rule still six months away, Chairman Gensler's move signaled the Commission's intention to abandon the Rule altogether.

81. Second, the Commission's Division of Corporation Finance issued a statement that it would not enforce the 2020 Rule, declaring that "the Division of Corporation Finance has determined that it will not recommend enforcement action based on . . . the [2020 Final Rules] during the period in which the Commission is considering further regulatory action in this area."

SEC Division of Corporation Finance, *Statement on Compliance with the Commission's 2019 Interpretation and Guidance Regarding the Applicability of the Proxy Rules to Proxy Voting Advice and Amended Rule 14a-1(1), 14a-2(b), 14a-9* (June 1, 2021), *available at* https://www.sec.gov/news/public-statement/corp-fin-proxy-rules-2021-06-01. This radical action effectively suspended the compliance date for the 2020 Rule without going through the same procedures used when issuing the Rule.

82.    This action was challenged as unlawful under the APA, given that it violates the APA's requirement that an agency must engage in notice-and-comment rulemaking when it revises a legislative regulation.    *See Nat'l Assoc. of Mfrs.* v. *SEC*, No. 21-cv-183 (W.D. Tex.).  That case is still pending.

83.    Third, the Commission moved to hold in abeyance ISS's legal challenge made to the 2020 Rule, pending the reconsideration of the 2020 Rule that Chairman Gensler announced that same day.  The motion also clarified that the Commission's concurrent statement of non-enforcement would provide all PVABs with relief from the upcoming December 1, 2021 compliance date for the 2020 Rule.  *See* Motion for Abeyance, *Institutional Shareholder Services Inc.* v. *SEC*, No. 19-cv-3275, Dkt. 53 at 4 (D.D.C. June 1, 2021).

84.    A little more than a week later, on June 11, 2021, Chairman Gensler and members of the Commission staff met in a closed-door meeting with representatives from large institutional investors who opposed the 2020 Rule.  Representatives from the following organizations attended the meeting:  the AFL-CIO; AFR; AssuranceMark; CalPERS; CalSTRS; CFA Institute; Consumer Federation of America; Council of Institutional Investors; CtW Investment Group; Interfaith Center on Corporate Responsibility; LACERA; Legal & General; New York City Comptroller; New York State Common; Segal Marco; Shareholder Rights Group; Sinclair Capital; Sustainable

Investments Institute; T. Rowe Price; The Shareholder Commons; Trillium Asset Management; US SIF; and ValueEdge Advisors. Many of these entities are prominent allies of the current administration that appointed Chairman Gensler.

85. Although neither a transcript nor minutes from the meeting were released to the public, according to a footnote in the Proposed Amended Rule, during that meeting, the representatives from those organizations apparently expressed opposition to the 2020 Rule, citing the costs of the Rule 14a-2(b)(9)(ii) conditions and the supposed lack of corresponding investor protection-based benefits. *See* Proposed Amended Rule at 13 n.24. The Commission has not produced or published any records relating to this closed-door meeting, including in response to Plaintiff U.S. Chamber's FOIA request seeking such records.

**F. The Commission's New ESG Disclosure Regulations**

86. At the same time that the Commission halted the enforcement of the 2020 Rule, limiting the availability of useful information to investors prior to the issuance of their proxy votes, the Commission was developing onerous new rules governing disclosures on various ESG issues on which certain Commissioners are looking to force a change in corporations' policies—purportedly in the name of providing additional transparency to investors.

87. In January 2022, the Commission opened a comment period on proposed rules under the Dodd-Frank Act that would require the disclosure to investors of the relationship, if any, between executive compensation and the company's executive performance. *SEC Reopens Comment Period of Pay Versus Performance*, SEC (Jan. 27, 2022), *available at* https://www.sec.gov/news/press-release/2022-11. Chairman Gensler stated that the move would "provide shareholders with information they need to evaluate a company's executive compensation policies." *Id.*

88.     In March 2022, the Commission released its proposed rule regarding mandatory and highly burdensome climate-related disclosures.  If approved, the rule would require companies "to include certain climate-related disclosures in their registration statements and periodic reports." *SEC Proposes Rules to Enhance and Standardize Climate-Related Disclosures for Investors*, SEC (Mar. 21, 2022) *available at* https://www.sec.gov/news/press-release/2022-46.  In promoting the rule changes, Chairman Gensler touted the rules as measures that "would provide investors with consistent, comparable, and decision-useful information for making their investment decisions" and stated that "[o]ver the generations, the SEC has stepped in when there's significant need for the disclosure of information relevant to investors' decisions." Gary Gensler, Chairman, U.S. Sec. & Exch. Comm'n, *Statement of Proposed Mandatory Climate Risk Disclosures* (Mar. 21, 2022), *available at* https://www.sec.gov/news/statement/gensler-climate-disclosure-20220321.

89.     But although the new Commission majority claims transparency and investor access to justify these ESG rules, the 2020 Rule that the Commission's majority is now abandoning created actual transparency on already existing corporate votes.  *See* Cross-Mot. for S.J., *ISS* v. *SEC*, No. 19-cv-3275, Dkt. 35-1 at 2 (D.D.C. Oct. 30, 2020) (Commission statement that 2020 Rule was designed to provide "investors who use proxy voting advice . . . access to more transparent, accurate, and complete information" to better guide their final proxy voting decisions).

90.     Moreover, increasing ESG reporting measures without preserving the key disclosure and issuer response provisions of the 2020 Rule would undermine the Commission's overarching goals in promulgating ESG disclosure rules.  PVABs already wield enormous influence in advising investors in these areas.

91.     Indeed, both ISS and Glass Lewis have adopted a number of voting policies on ESG issues.  For example, ISS generally will recommend against supporting a board for any company

in the Russell 3000 or S&P 1500 indices that does not meet ISS's standards for racial or gender diversity, while, beginning in 2023, Glass Lewis will recommend against nominating committee chairs whose directors do not meet Glass Lewis's standards for being gender diverse. *See* ISS, *U.S. Voting Policies 2022* at 12 (Dec. 13, 2021), *available at* https://www.issgovernance.com/file/policy/active/americas/US-Voting-Guidelines.pdf; Glass Lewis, *2022 Policy Guidelines* at 7 (2022), *available at* https://www.glasslewis.com/wp-content/uploads/2021/11/US-Voting-Guidelines-US-GL-2022.pdf?hsCtaTracking=257fcf1c-f11e-4835-81a3-d13fbc7b1f4c%7C1dad2378-213f-45f6-8509-788274627609.

92.     For climate issues, ISS adopted a new voting policy for 2022 that states that, for significant greenhouse gas emitters, ISS will recommend against the incumbent chair of the committee responsible for greenhouse gas emission oversight if ISS determines the company is not taking "minimum steps" required to understand, assess, and mitigate climate risks. Glass Lewis will similarly recommend a vote against the governance committee chair at a S&P 500 Index company if it does not disclose the board's oversight of environmental and social issues. *See* ISS, *U.S. Voting Policies 2022*, at 16-17,; Glass Lewis, *2022 Policy Guidelines*, at 8.

93.     PVABs play a critical role in controlling the flow of a company's important ESG information to investors by evaluating a company's progress in these areas and issuing proxy voting recommendations. When these recommendations are premised on factual or analytical errors, investors do not even theoretically benefit from this increased information, and, accordingly, cannot make the informed investment decisions the Commission seeks to promote.

### G.     The Proposed Amended Rule

94.     On November 26, 2021, the Commission, by a party-line vote, issued a proposed rule that eliminated two of the three key provisions of the 2020 Rule. *See Proxy Voting Advice*, 86 Fed. Reg. 67,383 (Nov. 26, 2021) (Proposed Amended Rule). The Proposed Amended Rule

also removed Note (e) to Rule 14a-9, which was added as part of the 2020 Rule and provides that the failure to make certain disclosures in proxy voting advice could constitute misleading information under the federal proxy rules.

95. The Proposed Amended Rule would remove the conditions set forth in Rule 14a-2(b)(9)(ii) that required PVABs to adopt written policies and procedures reasonably designed to (1) allow registrants that are the subject of voting advice to access that advice prior to or at the same time as PVABs disseminated that advice to their clients, and (2) provide their clients with a mechanism that would reasonably alert them to any registrant response to the recommendations before the shareholder vote. Proposed Amended Rule at 67,386. In short, the Proposed Amended Rule eradicated key protections instituted a year earlier in the 2020 Rule to ensure that proxy voting advice contained accurate factual information and that shareholders had access to complete decision-useful information.

96. In the words of dissenting Commissioner Peirce, "[t]he release takes a stab at justifying the rewrite, but we might as well simply acknowledge that the political winds have shifted." Hester M. Peirce, Commissioner, U.S. Sec. & Exch. Comm'n, *Dissenting Statement on Proxy Voting Advice Proposal* (Nov. 17, 2021), *available at* https://www.sec.gov/news/statement/peirce-proxy-advice-20211117. Commissioner Peirce also proposed that "[a] more reasonable approach would be to commit to a retrospective review of the 2020 Final Rules after three or five years to evaluate their effectiveness." *Id*.

## H. Rushed 30-Day Comment Period

97. Following its issuance of proposed rulemaking, the Commission provided for only an abbreviated 30-day comment period. This truncated comment period ran from November 27, 2021 through December 27, 2021, overlapping with the year-end holiday season, including Thanksgiving, Christmas, Hanukkah, and Kwanzaa, when many businesses are closed and key

members of staff are on vacation. The comment period also fell squarely in the middle of the busy year-end fiscal deadline for many public companies, during which time staff is focused on preparing and auditing financial statements. Needless to say, the truncated period was not reasonable for companies or other interested parties who desired to provide comment.

98. In response, several commenters, including Plaintiff U.S. Chamber, requested that the Commission extend the comment period to allow for a more robust public discussion. *See* U.S. Chamber of Commerce's Center for Capital Markets Competitiveness, Letter to SEC on Proxy Voting Advice Amendments (November 30, 2021); American Securities Association, Letter to SEC on Proxy Voting Advice Amendments (December 3, 2021). The Commission never responded to these requests.

99. Such a rushed comment period is unusual for any important financial regulatory proposals, such as the rulemaking at issue, much less one that marks a stark reversal of a newly issued rule adopted after a decade of deliberation. Indeed, members of Congress have now cited this rulemaking in letters to Chairman Gensler as an "egregious example" of the Commission's failure to provide adequate time to comment, *see* Letter from Senators William Hagerty and Tom Tillis to Chairman Gary Gensler (July 12, 2022), *available at* https://www.hagerty.senate.gov/wp-content/uploads/2022/07/2022-07-12-Gensler-Private-Funds-Letter.pdf, and stated that the "unreasonably short comment period[] . . . may run afoul of the Administrative Procedure Act," Jan. 10, 2022 Letter from Toomey to Gensler, *supra*, at 1, 2 n.4. Even one of the Commissioners spoke out about the "needlessly compressed" comment period and observed that it "likely deterred some interested persons from submitting comment letters" and "may have resulted in the Commission only seeing a narrower picture of the public concerns and failing to capture relevant data and perspectives." Mark T. Uyeda, Commissioner, U.S. Sec. & Exch. Comm'n, *Statement*

*on Proxy Voting Advice Proposal* (July 13, 2022), *available at* https://www.sec.gov/news/statement/uyeda-statement-amendments-proxy-voting-advice-071322.

100.    Legal commentators also took note of this unusual development, calling it "a step in the wrong direction" and a troubling sign of growing politicization in the Commission.  *See* David Dragics, *SEC Sacrifices Process to Block New Proxy Adviser Rules*, LAW360 (Jan. 26, 2022),  *available  at*  https://www.law360.com/articles/1458179/sec-sacrifices-process-to-block-new-proxy-adviser-rules.

101.    The unusual brevity of the comment period is further underscored when compared to the far more standard 60-day comment period utilized in connection with the original 2020 Rule. Indeed, the Administrative Conference of the United States, an independent federal agency designed to improve federal agency processes and procedures, recommends that a comment period of at least 60 days be used for significant regulatory actions.  *See* Administrative Conference of the United States, Rulemaking Comments, Recommendation No. 2011-2 (June 16, 2011), *available  at* https://www.acus.gov/recommendation/rulemaking-comments.     Similarly,  the Clinton and Obama Administrations recognized that in order to afford the public a meaningful opportunity to comment on a proposed regulation, a 60-day comment period will typically be required.  *See* Executive Order 13563, Improving Regulation and Regulatory Review (Jan. 18, 2011), 76 Fed. Reg. 3821 (Jan. 21, 2011); Executive Order 12866, Regulatory Planning and Review (Sept. 30, 1993), 58 Fed. Reg. 51735 (Oct. 4, 1993).

102.    This Administration itself has recognized the necessity of a sufficient comment period in order to adequately inform the rulemaking process.  Memorandum for the Heads of Executive Departments and Agencies, Modernizing Regulatory Review (Jan. 30, 2021), 86 Fed. Reg. 7,223 (Jan. 26, 2021).  Chairman Gensler, in recent statements to the House Appropriations

Subcommittee on Financial Services and General Government, stated that market participants are provided "always at least two months" to comment on Commission rule proposals. *House Appropriations Subcommittee on Financial Services and General Government Holds Hearing on the Fiscal Year 2023 SEC and Federal Trade Commission Budget Request*, at 6 (May 18, 2022). Furthermore, in the context of other proposed rules, the Commission has recently provided comment period extensions in response to commenter requests. Christopher Grobbel & Nicholas Losurdo, *SEC Extends Comment Periods for Recent Rulemakings*, JD Supra (May 11, 2022), *available at* https://www.jdsupra.com/legalnews/sec-extends-comment-periods-for-recent-8931358. The refusal to do so here—particularly in light of Chairman Gensler's professed policy of providing "at least two months"—is puzzling.

103. The 30-day comment period did not provide a meaningful opportunity for public input, particularly in light of the complex financial issues at play and the difficulty for commenters to obtain relevant data within this short time frame that also fell over the year-end holiday season. The inadequacy of the commenting period is directly borne out by the administrative record: the 2020 Rule generated more than 650 comments, while the Amended Rule garnered less than one-tenth of that amount (61 comments). Moreover, the majority of the limited comments submitted expressed opposition to the sudden rule change. To make matters worse, prior to the promulgation of the 2020 Rule, Commission staff engaged in 80 reported meetings with interested parties. In sharp contrast, the Commission staff held just one off-the-record meeting with pro-PVAB constituents and three open meetings during the amendment process.

104. The refusal to extend the truncated comment period was only one instance of a troubling pattern of stonewalling by the Commission. For example, in a bid to gain more information about the rulemaking process, including the closed-door meeting held with opponents

of PVAB regulation in June 2021, Plaintiff U.S. Chamber filed eight FOIA requests on February 1, 2022. Each request included a demand for expedited production given the time-sensitive nature of the rulemaking. The Commission almost immediately denied these requests for expedited treatment, as well as Plaintiff U.S. Chamber's subsequent appeal of this decision. Nor has the Commission provided Plaintiff U.S. Chamber with any of the requested information to date. Instead, the Commission has placed Plaintiff U.S. Chamber's FOIA requests on its so-called "complex track," and has averred that any response will take at least 36 months.

**I.    The Amended Rule**

105.    On July 13, 2022, the Commission, again by a 3-2 party-line vote, issued the Amended Rule. The substance of the Amended Rule remained entirely unchanged from the version the Commission circulated before the rushed comment period, removing the conditions set forth in Rule 14a-2(b)(9)(ii) that required PVABs to adopt written policies and procedures reasonably designed to (1) allow registrants that are the subject of voting advice to access that advice prior to or at the same time as PVABs disseminate that advice to their clients, and (2) provide their clients with a mechanism that would reasonably alert them to any registrant response to the recommendations before the shareholder vote. Amended Rule at 43,169.

106.    The Commission attempted to justify this abrupt about-face from the 2020 Rule by relying on two arguments. Neither withstands scrutiny.

107.    First, the Commission stated that PVABs continue to oppose the 2020 Rule and the Commission now agreed with their concerns that the 2020 Rule may have "adverse effects on the cost, timeliness, and independence of proxy voting advice." *Id.* at 43,170. But the Commission offered no explanation as to how the 2020 Rule could possibly have had such effects. It is difficult to surmise how requiring PVABs to submit their voting recommendations to subject companies

after they have been completed could conceivably influence those recommendations' timeliness, cost, or independence.

108.     As supposed support for this position, the Commission simply cited the purportedly "strong opposition" from institutional investors and PVABs that it had received.  *Id.*    That feedback was, in any event, made as part of the comments those parties submitted to the 2019 Proposed Rule (which became the 2020 Rule in amended form).  The Proposed Rule would have required PVABs to submit draft report recommendations *before* delivering them to clients.  *See* 84 Fed. Reg. at 66,529.  The substance of those comments was thoroughly considered and properly addressed by the Commission in the revisions—including significant concessions to PVABs—that it made to the final 2020 Rule.  In other words, these stale comments were mooted by the Commission's careful rulemaking process leading to the final 2020 Rule.

109.     Second, the Commission claimed that "certain voluntary practices of PVABs . . . advance the goals underlying the Rule 14a-2(b)(9)(ii) conditions," Amended Rule at 43,170, seemingly concluding that regulation was no longer required in light of these "market based" practices.  *Id.* at 43,177.  But this statement cannot be squared with the fact that one of the two largest PVABs, ISS, has actually reduced its communications and transparency below what its practices were before the 2020 Rule was promulgated, and neither of the two largest PVAB's practices accomplishes the same aims as the 2020 Rule.

110.     Specifically, as the Commission acknowledged in the Proposed Rule, ISS now only provides a company with a copy of its proxy voting advice about that company *after* the information has been disseminated to clients, and therefore after many of their clients have already voted.  Amended Rule at 43,184.  Companies can dispute recommendations after-the-fact by emailing ISS or sending a message through its "Help Center," but ISS will only send an alert to

clients who previously received the proxy voting advice if ISS decides to issue an update to its advice. And before it issues its advice, ISS no longer proactively engages with all companies, but rather the onus is on companies to request engagement with ISS's proxy research teams. Proposed Amended Rule at 67,386.

111. For its part, Glass Lewis provides a report to *certain* companies that are the subject of its proxy voting advice, describing the primary underlying facts that inform its recommendations prior to the advice being sent to clients. *Id.* These select companies then have 48 hours to review and provide suggested updates to potentially be incorporated into the final recommendations. *Id. After* Glass Lewis disseminates its proxy voting advice—and therefore after some of its clients are likely to have already voted—Glass Lewis provides a method for companies to report errors in that advice, but Glass Lewis only notifies clients if it updates its advice. *Id.*

112. These internal—and merely voluntary—PVAB practices fall short of the requirements imposed under the 2020 Rule. Furthermore, the Commission already considered these practices (or ones similar to them) in 2020 at the time of the original rulemaking and rejected them as insufficient. Specifically, the Commission stated that "[a]lthough it is encouraging that some proxy voting advice businesses have programs in place pursuant to which some registrants have the opportunity to review and provide feedback on or responses to proxy voting advice, those programs have not been universally adopted by proxy voting advice businesses and do not uniformly provide registrants (and their investors) with the same opportunities for (and benefits of) review, feedback, and response." 2020 Rule at 55,108. Accordingly, PVABs' voluntary practices do not constitute new facts or information as the Commission attempts to portray them in an effort to justify the abrupt rule change. *Id.* at 55,134 n.594.

113.    Nonetheless, to bolster the Commission's conclusion that voluntary PVAB practices absolve the need for regulation, the Commission also noted that the Independent Oversight Committee of the Best Practice Principles Group, an industry group comprising six PVABs and other industry members, had found in its 2021 Annual Report that Glass Lewis and ISS had met the industry-set standards for best practices across the categories of service quality, conflicts of interest avoidance, and communications policy.  Amended Rule at 43,184.  The Commission admitted that the third major PVAB in the United States, Egan-Jones, is not a member of the Best Practice Principles Group.  *Id.*

114.    The recent establishment of the Independent Oversight Committee and the creation of its Annual Report (which was issued for the first time in 2021) suggests it is nothing more than a thinly disguised effort to lend credence to the rollback of the 2020 Rule, not evidence that the PVAB industry has a proven track record of appropriately regulating itself.

115.    Furthermore, the Commission went on to refute its own logic, conceding that these voluntary standards fall short of "replicat[ing] the requirements of the Rule 14a-2(b)(9)(ii) conditions" and do not "result in the same benefits that those conditions were intended to produce." *Id.* at 43,177; *see* Proposed Amended Rule at 67,388 (acknowledging that "absent the Rule 14a-2(b)(9)(ii) conditions, there is no assurance that a new entrant to the PVAB market will adopt similar mechanisms or that existing PVABs will maintain them").

116.    The Amended Rule also removed Note (e) to Rule 14a-9, which provided examples of situations in which the failure to make certain disclosures in proxy voting advice could constitute misleading information under the federal proxy rules.  Amended Rule at 43,180.

117.    The Commission tried to justify this change on the basis that the note could lead to "a risk of confusion" and "heighted legal uncertainty" for  PVABs.  *Id.* at 43,181.  Such a

justification directly contradicts the findings of the Commission in the 2020 Rule, where it concluded that it "d[id] not expect the new amendment to Rule 14a-9 to generate significant new litigation risk." 2020 Rule Release at 55,140. The Commission fails to cite any new evidence to support the opposite view now.

118. Finally, with only cursory explanation, the Amended Rule rescinded the 2020 Guidance issued in conjunction with the 2020 Rule, which, among other things, urged investment advisors to adapt their robo-voting procedures to allow subject companies to respond to inaccuracies in PVAB recommendations. Amended Rule at 43,178. According to the Commission, this guidance was no longer necessary given the Amended Rule's repeal of the key aspects of the 2020 Rule.

119. The promulgation of the Amended Rule was not supported by the administrative record in the first instance and therefore both the 2020 Rule and the 2020 Guidance should have been kept in place. In any event, the repeal of this common-sense guidance surrounding robo-voting was particularly unjustified given that numerous comments to the Amended Rule expressed concern with institutional investor and investment advisor "overreliance" on PVABs' voting recommendations as reflected in the use of automated voting systems. Professor Tao Li, Amendments to the Proxy Rules for Proxy-Voting Advice (December 17, 2021), *available at* https://www.sec.gov/comments/s7-17-21/s71721-20109924-264259.pdf.

**J.    Improper Calculation of the Costs and Benefits of the Amended Rule**

120. As required by the Exchange Act, the Amended Rule contains an economic analysis of the market impact of the Rule. *See* 25 U.S.C. § 78c(f). However, that analysis—which amounts to only 24 pages, in stark contrast to the 73-page economic analysis conducted in connection with the 2020 Rule—improperly focused on the supposed financial benefits of the Amended Rule for

PVABs' profitability while minimizing its significant costs to publicly traded companies and investors. *See* Amended Rule at 43,183-43,189.

121.    On the benefits side of its analysis, the Commission considered the savings to PVABs—measured in employee hours, not in dollars—from not needing to comply with the notice and response provisions of the 2020 Rule. *Id.* at 43,186. But the logic used to calculate these benefits is internally inconsistent. Specifically, the Commission assumes that PVABs will self-regulate and provide on their own initiative much of the information the 2020 Rule would have required. If the Commission is correct that PVABs will self-regulate even without the requirements of the 2020 Rule, then the supposed burden on PVABs of complying with the requirements of the 2020 Rule is overstated.

122.    For example, the Commission said that the removal of the notice and response provisions in the Amended Rule would save PVABs the expense of informing their clients of any response materials from companies that are the focus of their proxy voting advice. But the Commission also assumes that PVABs have in place internal procedures aimed at enabling feedback from certain registrants before the PVABs issue voting advice. If that is true, then the cost savings in employee hours from not simply notifying their clients of that information is likely small given that PVAB employees are already collecting this feedback.

123.    Turning to the cost side of the analysis, the Commission improperly understates the significant costs imposed on companies and investors under the Amended Rule. Among the costs is that corporate governance decisions will be made based on low-quality, incomplete, and error-riddled advice issued by PVABs that companies cannot address prior to the shareholder vote. The Commission minimized these costs based on the unfounded assumption that PVABs will self-regulate (in a more efficient manner) and provide some subset of the information the 2020 Rule

would have required on their own initiative. But as dissenting Commissioner Peirce noted, this outcome is unlikely. Due to the concentration in the PVAB market, PVABs have limited incentives to engage with companies, particularly because amending reports is financially costly and can risk reputational harm. *See* Hester M. Peirce, Commissioner, U.S. Sec. & Exch. Comm'n, *U-Turn: Comments on Proxy Voting Advice* (July 13, 2022), *available at* https://www.sec.gov/news/statement/peirce-statement-proxy-voting-advice-071322.

124. Even the Commission's majority concedes that current policies vary among PVABs and that it does not know if PVABs will continue to maintain these policies in the absence of regulation. Furthermore, these voluntary procedures are inferior to the protections to investors and companies included in the 2020 Rule. *See supra* ¶¶ 109-113. Accordingly, the economic analysis does not properly take into account the true costs to companies and investors from the introduction to the market of voting recommendations based on incorrect data or analysis.

125. In addition, the economic analysis also fails to consider altogether the costs under the Amended Rule that could accrue from the PVABs acting on self-interested objectives instead of maximizing shareholder value. Indeed, the Commission has recognized and explicitly factored into its rulemaking on other subjects the significant costs of even considering, let alone implementing, shareholder proposals that are not value-enhancing. 17 C.F.R. § 240 (Substantial Implementation, Duplication, and Resubmission of Shareholder Proposals Under Exchange Act Rule 14a-8). The costs of imposing proposals that are not value enhancing must be considered in this context as well given the recognition by the Commission of how PVABs often have conflicts of interest or can be beholden to powerful institutional investors. While the Amended Rule still requires PVABs to disclose potential conflicts of interest, these allegiances may still improperly bias PVAB voting recommendations. But because the Amended Rule removes the mechanism for

companies to respond to PVAB recommendations in a timely fashion, these potentially biased recommendations are provided to proxy voters and will go unrebutted before shareholders vote.

## CLAIMS FOR RELIEF

### COUNT I
### Administrative Procedure Act
### (Failure to Provide Adequate Opportunity for Comment)
5 U.S.C. § 553

126.    Plaintiffs repeat and incorporate by reference all of the allegations set forth above.

127.    The APA requires a reviewing court to hold unlawful and set aside any agency action that is "arbitrary [or] capricious," 5 U.S.C. § 706(2)(A), as well as proscribing any agency action that is "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

128.    In line with these directives, the APA requires that any agency, before promulgating a substantive rule, issue a notice of proposed rulemaking that provides for a comment period in order to "give interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments."  5 U.S.C. § 553(c).  Failure to do so renders an agency action in violation of the procedure required by law.

129.    When determining what constitutes an adequate comment period, "[i]n cases involving the repeal of regulations, courts have considered the length of the comment period utilized in the prior rulemaking process." *Becerra* v. *U.S. Dep't. of the Int*., 381 F. Supp. 3d 1153, 1177 (N.D. Cal. 2019) (concluding that a 30-day comment period for the repeal of rule created following a 120-day comment period was inadequate); *Pangea Leg. Services* v. *U.S. Dep't. of Homeland Sec*., 501 F. Supp. 3d 792, 820 (N.D. Cal. 2020) (finding 30-day comment period that "spann[ed] the holidays" inadequate in light of importance of subject matter and magnitude of rule, particularly compared to comment periods for similar rules); *Est. of Smith* v. *Bowen*, 656 F. Supp. 1093, 1098-99 (D. Colo. 1987) (comment period of 60 days found inadequate, *inter alia*,

because the subject involved "great numbers of interested persons" and bureaucratic organizations that could not reasonably comment in 60 days).

130.    The 30-day comment period provided by the Commission concerning the Amended Rule was inadequate not only in light of the 60-day period used for the promulgation of the 2020 Rule, but also given the complex financial issues at play and the hardship commenters faced in obtaining relevant data and complying with this truncated time frame that also fell over the year-end holiday season, as interested parties, lawmakers, and a dissenting Commissioner alike expressed.  The inadequate nature of the comment period was made manifest when it yielded fewer than one-tenth of the comments received concerning its predecessor, the 2020 Rule.

131.    Indeed, Defendant Gensler has effectively recognized the insufficiency of a 30-day commenting period, stating to the House Appropriations Subcommittee on Financial Services and General Government that market participants are provided "always at least two months" to comment on Commission rule proposals.  That "always," however, did not apply for some unexplained reason to the Amended Rule here.

132.    As a result, interested parties, such as Plaintiffs, did not have a full and fair opportunity to comment on the Amended Rule before it was finalized.

133.    For these reasons, the Commission's promulgation of the Amended Rule was arbitrary, capricious, and without observation of procedure required by law.  Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706, and the Amended Rule must be held unlawful and set aside.

## COUNT II
### Administrative Procedure Act
**(Arbitrary, Capricious and Not in Accordance with Law-Deficient Economic Analysis)**
5 U.S.C. § 706

134.    Plaintiffs repeat and incorporate by reference all of the allegations set forth above.

135. The APA requires a reviewing court to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

136. Under Section 3(f) of the Exchange Act, the Commission is required to consider the impact of a proposed rule on "efficiency, competition, and capital formation." 25 U.S.C. § 78c(f). Failure to do so renders agency action "not in accordance with law" under the APA.

137. The Commission has been found to act arbitrarily and capriciously when it neglects its statutory responsibility to "adequately . . . assess the economic effects of a new rule." *Bus. Roundtable* v. *SEC*, 647 F.3d 1144, 1148 (D.C. Cir. 2011); *see also Chamber of Com. of U.S.* v. *SEC*, 412 F.3d 133, 144 (D.C. Cir. 2005) (holding that the Commission must "apprise itself—and hence the public and the Congress—of the economic consequences of a proposed regulation").

138. The Commission failed to conduct an adequate cost-benefit analysis to justify its amendments rolling back the 2020 Rule.

139. The cursory analysis accompanying the Amended Rule "opportunistically frame[s] the costs and benefits of the rule," *Bus. Roundtable*, 647 F.3d 1148-49, improperly focusing on the benefits to PVABs' profitability and ignoring significant costs to companies and investors. Namely, the analysis does not account for the significant costs to companies and investors from the issuance of PVAB voting recommendations premised on inaccurate information or faulty analysis, a cost that will increase given that businesses now have limited recourse to issue corrective responses prior to a shareholder vote. To the extent this cost is considered, the Commission minimizes it by relying on the unfounded assumption that PVABs will adequately

self-regulate and voluntarily follow aspects of the 2020 Rule without formal regulatory obligations.

140.    Furthermore, the Commission's supposed analysis of savings to PVABs, described as a benefit under the Amended Rule, is also defective. The Commission considers as a benefit of the Amended Rule the cost savings to PVABs, which it measures in reduced employee hours needed for compliance with the 2020 Rule. But the Commission's analysis is inherently contradictory because it assumes the PVABs will self-regulate and thus comply with the key requirements of the 2020 Rule. If PVABs are voluntarily adopting some of the same practices as the 2020 Rule required, then the cost savings to PVABs under the Amended Rule are negligible, if not non-existent. The Commission fails to address what additional cost savings will inure to PVABs if they are engaging in substantially the same behavior with or without the requirements of the 2020 Rule.

141.    For these reasons, the Commission's promulgation of the Amended Rule was arbitrary and capricious and not in accordance with law. Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706, and the Amended Rule must be held unlawful and set aside.

## COUNT III
### Administrative Procedure Act
**(Arbitrary and Capricious-Failure to Engage in Reasoned Decision making)**
5 U.S.C. § 706

142.    Plaintiffs repeat and incorporate by reference all of the allegations set forth above.

143.    The APA requires a reviewing court to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

144.    The APA mandates that an agency "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor*

48

*Vehicle Mfrs. Ass'n of U.S.* v. *State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) (citation omitted). An agency rule will be found to be arbitrary and capricious on this ground when an agency has "offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

145.    Each of the justifications for the Amended Rule that the Commission offered fails this test.

146.    First, the Commission cites opposition to the 2020 Rule by PVABs and investor groups to conclude that amendment was necessary to avoid "adverse effects on the cost, timeliness, and independence of proxy voting advice." Amended Rule at 43,170. But the Commission did not go beyond those conclusory statements to explain how a requirement that PVABs make their recommendations available to subject companies *after* their completion could possibly have such adverse effects. The Commission instead relied entirely on the *ipse dixit* of PVABs and institutional investors. The Commission was obligated to "critically review" the analysis provided by such interested parties or perform its own analysis to support factual claims. *See Susquehanna Int'l Grp.* v. *SEC*, 866 F.3d 442, 447 (D.C. Cir. 2017). The Commission failed to do either here, a failure that is especially evident given that the cited opposition used to justify the new rulemaking was made in the context of the 2019 version of the 2020 Rule and had already been addressed through various concessions. In addition, the vague and speculative nature of this hypothesized harm—*i.e.*, the potential for "adverse effects"—further underscores the lack of critical review undertaken by the Commission. In the absence of this required independent analysis and fact-finding, the Commission's stated rationale is insufficient.

147.     Second, the Commission posits that the proxy-advisor issues have been resolved by the industry's voluntary standards, noting improvements to PVAB processes and transparency made in the past year.  *See* Amended Rule at 43,170.  But the Commission must do more than simply accept an industry's claims of proper self-regulation.  *See Susquehanna Int'l Grp.*, 866 F.3d at 446 ("[t]rusting the process" of a self-regulated organization "is not enough").  Moreover, this justification is in conflict with the Commission's own acknowledgment that *the largest PVAB* has altered its practices in a way that reduces communication and transparency with issuers and its clients.  Accordingly, this rationale is also unsatisfactory.

148.     Separately, to justify deleting Note (e) to Rule 14—which gives examples of omissions from proxy voting advice that could be considered materially false or misleading under the securities laws—the Commission cites both potential confusion about the note and "heighted legal uncertainty" for PVABs.  Amended Rule at 43,170.  Neither explanation is reasonable.

149.     As an initial matter, the risk of confusion cited by the Commission is implausible. The specific examples delineated in Note (e) provide a helpful tool for understanding how the liability standard applies.  And, in amending the Rule, the Commission emphasized that the removal of the examples is not intended to change the liability standard.  Thus, rather than lessening confusion about the liability standard, the Commission's decision to eliminate illustrative examples has only heightened confusion and created uncertainty.

150.     Second, the Commission's explanation that removal of this provision is needed to address the PVABs' concern of "heightened legal uncertainty" is directly contradicted by the 2020 Rule's findings that Note (e) would not "generate significant new litigation risk" because it "d[id] not broaden the concept of materiality or create a new cause of action."  85 Fed. Reg. 55,082,

55,140 (Sept. 3, 2020). The Commission offers no new evidence to justify disregarding these earlier findings nor to support its adoption of the PVABs' self-serving views.

151.   For these reasons, the Commission's promulgation of the Amended Rule was arbitrary and capricious. Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706, and the Amended Rule must be held unlawful and set aside.

152.   Furthermore, because the agency retracted the 2020 Guidance on automatic voting procedures solely based on the Amended Rule, the rescission of that guidance should also be set aside under 5 U.S.C. § 706.

<u>**COUNT IV**</u>
<u>**Administrative Procedure Act**</u>
**(Arbitrary and Capricious-Failure to Provide Enhanced Justification for Rule Change)**
5 U.S.C. § 706

153.   Plaintiffs repeat and incorporate by reference all of the allegations set forth above.

154.   The APA requires a reviewing court to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

155.   When departing from precedent, an agency is required to provide enhanced justifications for the change when "the new policy rests upon factual findings that contradict those that underlay its prior policy" or "when [the] prior policy has engendered serious reliance interests." *FCC* v. *Fox TV Stations, Inc*., 556 U.S. 502, 515 (2009). The Commission fails to do so here.

156.   In the Amended Rule, the Commission impermissibly discarded past factual findings made in the 2020 Rule "without a reasoned explanation." *Organized Village of Kake* v. *U.S. Dep't of Agric*., 795 F.3d 956, 967, 969 (9th Cir. 2015). For example, the Commission previously found in the 2020 Rule that regulation beyond voluntary PVAB practices was necessary

to protect shareholders, 2020 Rule at 67,388; that due to PVABs' unique role in the market, any proxy solicitation exception must be "appropriately tailored to their unique role in the proxy process," *id.* at 55,084; that "the interests of shareholders are best served by more, and not less, discussion of matters presented for a vote," 2020 Rule at 55,085; and that Note (e) did not generate significant new litigation risk, *id.* at 55,140. Now, without explanation, the Commission holds in the Amended Rule that the opposite is true.

157. The Commission also failed to take into account the reliance interests engendered by the 2020 Rule. *See Dep't. of Homeland Sec.* v. *Regents of the U. of Cal.*, 140 S. Ct. 1891, 1915 (2020). Companies, including Plaintiffs' members, had already begun modifying their internal policies and engagement with shareholders and proxy advisors on proxy matters in anticipation of the 2020 Rule being in effect for the 2022 proxy season.

158. For these reasons, the Commission's promulgation of the Amended Rule was arbitrary and capricious. Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706, and the Amended Rule must be held unlawful and set aside.

## COUNT V
## Administrative Procedure Act
### (Arbitrary and Capricious-Failure to Consider Alternative Proposals)
5 U.S.C. § 706

159. Plaintiffs repeat and incorporate by reference all of the allegations set forth above.

160. The APA requires a reviewing court to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

161. Under the APA, "an agency has a duty to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives." *Farmers Union Cent. Exch., Inc.* v. *FERC*, 734 F.2d 1486, 1511 (D.C. Cir. 1984); *see also Yakima Valley*

*Cablevision, Inc.* v. *FCC*, 794 F.2d 737, 746 n.36 (D.C. Cir. 1986) (noting that "[t]he failure of an agency to consider obvious alternatives has led uniformly to reversal").

162.    Furthermore, the Commission has a special obligation to consider an alternative proposal or objection raised by a dissenting Commissioner when it is "neither frivolous nor out of bounds." *Chamber of Commerce*, 412 F.3d at 144–45.

163.    The Commission failed to adequately consider and respond to an alternative proposal raised by Commissioner Peirce and other commenters.  In opposing the Proposed Amended Rule as "lack[ing] a sound basis" for amendment due to the unchanged factual landscape, Commissioner Peirce suggested that "[a] more reasonable approach would be to commit to a retrospective review of the 2020 Final Rules after three or five years to evaluate their effectiveness."   Hester M. Peirce, Commissioner, U.S. Sec. & Exch. Comm'n, *Dissenting Statement on Proxy Voting Advice Proposal* (Nov. 17, 2021), *available at* https://www.sec.gov/news/statement/peirce-proxy-advice-20211117.    As the Commission acknowledged, other commenters suggested this alternative as well.  Amended Rule at 43,174.

164.    Despite noting this alternative, the Commission did not address this proposal in any meaningful way in the Amended Rule, much less provide a reasoned explanation for its rejection.

165.    Nor did the Commission consider any "alternatives . . . within the ambit of the existing policy," *Regents*, 140 S. Ct. at 1913, with respect to Note (e).  For example, instead of eliminating Note (e), the Commission could have simply issued supplemental guidance clarifying its meaning and thereby eliminate any supposed "risk of confusion" regarding this aspect of the 2020 Rule.  Amended Rule at 43,181.

166.    As a result, the Commission's promulgation of the Amended Rule was arbitrary and capricious.  Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706, and the Amended Rule must be held unlawful and set aside.

## COUNT VI
### Administrative Procedure Act
**(Arbitrary and Capricious-Inconsistent Treatment of Proxy Process Participants)**
5 U.S.C. § 706

167.    Plaintiffs repeat and incorporate by reference all of the allegations set forth above.

168.    The APA requires a reviewing court to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

169.    Unexplained inconsistency in rulemaking is "a reason for holding an interpretation to be an arbitrary and capricious change from agency practice under the [APA]."  *Nat'l Cable & Telecomm. Ass'n* v. *Brand X Internet Servs.*, 545 U.S. 967, 981 (2005).  Indeed, "[a] long line of precedent has established that an agency action is arbitrary when the agency offered insufficient reasons for treating similar situations differently."  *Transactive Corp.* v. *United States*, 91 F.3d 232, 237 (D.C. Cir. 1996).

170.    The Amended Rule has two primary areas of unexplained inconsistency.

171.    First, the Amended Rule treats PVABs differently from other regulated parties with respect to self-regulation.  For example, in recent years, the Commission has rejected voluntary industry regulation as a sufficient safeguard for other regulated parties, such as in the Regulation Best Interest rule governing brokers.  *See* 84 Fed. Reg. 33,318 (July 12, 2019).  And as already detailed, the Commission claims that voluntary measures are insufficient and a uniform system is required for issuer climate disclosures.  *See* Gary Gensler, Chairman, *U.S. Sec. & Exch. Comm'n, Prepared Remarks Before the Principles for Responsible Investment Climate and Global Financial*

*Markets Webinar* (July 28, 2021), *available at* https://www.sec.gov/news/speech/gensler-pri-2021-07-28 (stating his belief that "when disclosures remain voluntary, it can lead to a wide range of inconsistent disclosures"). The Commission has also recently expressed its belief that industry self-regulation is no longer suitable in the areas of cryptocurrency and share buybacks. *See* Fall 2021 RegFlex Agenda, 17 C.F.R. Ch. II. Yet in the area of proxy advisor recommendations, the Commission has decided that non-binding industry self-regulation—which it concedes is far from comprehensive or complete—is sufficient without acknowledging, much less explaining, this divergent treatment. This inconsistent treatment of regulated parties without adequate explanation is arbitrary and capricious.

172. Second, the Amended Rule treats shareholders inconsistently.

173. Shareholders are not a monolithic group. Some are focused on the best interests of the company alone. Others have broad portfolios and vote based on a range of holdings and interests outside the company. Then too, some investors—and especially large institutional investors—generate substantial business for PVABs and may influence those advisors' recommendations, as the Commission has previously acknowledged. Indeed, the 2020 Rule was designed to bring greater transparency to this process, allowing companies the opportunity to respond to PVABs' recommendations, which would generate greater information for shareholders—including shareholders that may not use proxy advisors. And as Chairman Gensler himself has recognized (albeit in other contexts), transparency is at the very "heart of the SEC's mission to protect investors, maintain fair, orderly, and efficient markets, and facilitate capital formation." Gary Gensler, Chairman, U.S. Sec. & Exch. Comm'n, *Prepared Remarks Before the*

*Principles for Responsible Investment Climate and Global Financial Markets Webinar* (July 28, 2021), *available at* https://www.sec.gov/news/speech/gensler-pri-2021-07-28.[2]

174. Unlike the situation at hand, the Commission has typically subjected motivated shareholders to heightened scrutiny, as with activist investors who attempt to force a company sale or shareholders who attempt to take a public company private.

175. As a specific matter, the Commission has repeatedly emphasized the importance of informational disclosure to investors during the proxy process and, to underscore this general principle, has recently adopted regulations to this effect. *See* Release No. 34-93596, SEC Proxy Rule. For example, the new Universal Proxy rule requires that all board options should be presented to shareholders in a single proxy card, *see SEC Adopts New Rules for Universal Proxy Cards in Contested Director Elections* (Nov. 17, 2021), *available at* https://www.sec.gov/news/press-release/2021-235, and the recent amendments to Rule 14a-8 broadened the eligibility for shareholders to submit a proposal for inclusion in a company's proxy statement, *see SEC Adopts Amendments to Modernize Shareholder Proposal Rule*, (Sept. 23, 2020), *available at* https://www.sec.gov/news/press-release/2020-220.

176. The Commission has not offered an adequate explanation as to why investors should have more information in an easily digestible format for other aspects of proxies—but client-investors should receive only proxy advisor recommendations without the option for clients or non-clients of the proxy firms to receive companies' responses.

---

[2] In a speech Chairman Gensler again reiterated this general principle when describing the supposed importance of mandatory climate disclosures by companies, noting that "[w]hen disclosures remain voluntary, it can lead to a wide range of inconsistent disclosures." Chairman Gensler, *Prepared Remarks before the Principles for Responsible Investment Climate and Global Financial Markets Webinar* (July 28, 2021), *available at* https://www.sec.gov/news/speech/gensler-pri-2021-07-28.

177.     For these reasons, the Commission's promulgation of the Amended Rule was arbitrary and capricious.  Plaintiffs are therefore entitled to relief pursuant to 5 U.S.C. §§ 702, 706, and the Amended Rule must be held unlawful and set aside.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court enter judgment in its favor and against Defendants as follows:

(i)     A declaratory judgment that the Amended Rule at issue in this lawsuit is arbitrary, capricious, or otherwise contrary to law within the meaning of the Administrative Procedure Act, *see* 5 U.S.C. § 706(A);

(ii)    An order vacating and setting aside the Amended Rule in its entirety pursuant to the Administrative Procedure Act, *see* 5 U.S.C. § 706(2);

(iii)   An order issuing all process necessary and appropriate to delay the effective date and implementation of the Amended Rule pending the conclusion of this case;

(iv)    An order setting aside Defendants' suspension of the compliance date for the 2020 Rule;

(v)     An order awarding Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action; and

(vi)    Any other relief as the Court deems just and equitable.

Dated:  July 28, 2022

U.S. CHAMBER LITIGATION
CENTER:
Daryl Joseffer, *of counsel*
Tyler S. Badgley, *of counsel*
1615 H Street NW
Washington,  D.C.  20062
Tel:  (202) 463-5337
djoseffer@uschamber.com

BUSINESS ROUNDTABLE
Liz Dougherty, *of counsel*
1000 Maine Avenue SW
Washington, DC  20024
202-872-1260
ldougherty@brt.org

 /s/  *Paul S. Davidson*
Paul S. Davidson (Tenn. BPR No. 011789)
Michael A. Cottone (Tenn. BPR No. 033253)
WALLER LANSDEN DORTCH & DAVIS
LLP
511 Union Street, Suite 2700
Nashville, Tennessee 37219
Phone: (615) 244-6380
Fax: (615) 244-6804
paul.davidson@wallerlaw.com
michael.cottone@wallerlaw.com

Jeffrey B. Wall (*pro hac vice pending*)
Elizabeth A. Rose (*pro hac vice pending*)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Washington, D.C.  20006-5215
Tel:  (202) 956-7000
wallj@sullcrom.com
rosee@sullcrom.com

Matthew A. Schwartz (*pro hac vice pending*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
Tel:  (212) 558-4000
schwartzm@sullcrom.com

*Counsel for Plaintiffs Chamber of
Commerce of the United States, Business
Roundtable, and Tennessee Chamber.*