UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, BUSINESS ROUNDTABLE, and TENNESSEE CHAMBER OF COMMERCE AND INDUSTRY, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 3:22-cv-00561 |
| | ) | Judge Aleta A. Trauger |
| SECURITIES AND EXCHANGE COMMISSION and GARY GENSLER, in his official capacity as Chairman of the Securities and Exchange Commission, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM

Plaintiffs Chamber of Commerce of the United States of America ("Chamber"), Business Roundtable, and Tennessee Chamber of Commerce and Industry have filed a Motion for Summary Judgment (Doc. No. 32), to which defendants the Securities and Exchange Commission ("SEC") and SEC Chair Gary Gensler have filed a Response (Doc. No. 61). The defendants have filed a Cross-Motion for Summary Judgment (Doc. No. 57), to which the plaintiffs have filed a Response (Doc. No. 64), which also serves as a Reply in support of the plaintiffs' motion. For the reasons set out herein, the plaintiffs' motion will be denied, and the defendants' motion will be granted.

# I. BACKGROUND

## A. Proxy Voting and PVABs

Ownership of shares in a public company typically includes a right to vote on certain corporate matters. If an investor owns stock in only a single company, then the questions put to a vote regarding that company can receive the entirety of the investor's focus and attention. If, however, an investor builds a diversified portfolio including voting shares of many companies, then the investor's attention, by necessity, must be divided. This produces two closely related problems: first, the investor must deal with the sheer logistical challenges of participating in many different shareholder votes, which are typically held at in-person meetings; and, second, the investor must be capable of making informed choices about numerous, often sharply different corporate matters, spread across different companies, industries, and markets.

These problems are particularly stark among the large institutional investors that "today own, by some estimates, between 70 and 80 percent of the market value of U.S. public companies." (Doc. No. 62 ¶ 2 (quoting 84 Fed. Reg. 66,518 (Dec. 4, 2019)). "[I]nstitutional investors, by virtue of their holdings in many public companies . . . must manage the logistics of voting in potentially hundreds, if not thousands, of shareholder meetings and on thousands of proposals that are presented at these meetings each year, with the significant portion of those voting decisions concentrated in a period of a few months." (*Id.* ¶ 3 (quoting 85 Fed. Reg. 55,082 at 55,083).) According to some observers, that problem is only becoming more daunting, as publicly traded companies face "record-breaking number[s] of shareholder proposals." (Doc. No. 35-3 at 2.)

The logistical hurdles of shareholder voting are ameliorated somewhat by the fact that "most shareholders of publicly traded companies exercise their right to vote on corporate matters

through the use of proxies," as the law of corporations generally permits them to do. (Doc. No. 35-2 at 55,082.) *See, e.g.*, Tenn. Code Ann. § 48-17-203(a) ("A shareholder may vote such shareholder's shares in person or by proxy."). The availability of proxy voting, however, does more than simply make voting easier. It also creates an opportunity for the supporters or opponents of particular proposals to, in effect, campaign for their positions by soliciting the proxy authority of shareholders. Such solicitations are particularly common as a tool for a publicly traded company's management to ensure ratification of its preferred course of action, *see J. I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964), although other people and groups can use the proxy solicitations as well, *see* 17 C.F.R. § 240.14a-101.

Because the matters being put to a vote often involve high-stakes questions of corporate policy, a great deal of investor value depends on the accuracy and reliability of proxy solicitations. Many investors have accordingly supported rules to "prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation." *Borak,* 377 U.S. at 431. In response to those concerns, Congress included proxy solicitations among the communications governed by the SEC under the Securities Exchange Act of 1934 ("Exchange Act").

Congress, however, has elected not to regulate the fine details of proxy solicitation legislatively, but has instead opted to entrust that power to the SEC through the legislative command that it is "unlawful for any person . . . to solicit any proxy . . . in respect of any [registered] security . . . in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78n(a)(1). The rules that the SEC has promulgated pursuant to that authority include both substantive requirements—most prominently, a prohibition on false or misleading

statements of material fact, *see* 17 C.F.R. § 240.14a-9—and procedural ones, including a requirement that the soliciting party file "preliminary copies" of any proxy solicitation with the SEC unless subject to a specific exception, *see* 17 C.F.R. § 240.14a-6.

Despite the availability of proxies and the regulation of proxy solicitations, large institutional investors still sometimes struggle with the effective management of their diverse and considerable voting rights. A class of entities—known as "proxy voting advice businesses," or "PVABs"—has arisen to meet the needs of those investors. "PVABs provide institutional investors and intermediaries . . . with research and analysis on shareholder proposals from publicly traded companies" and provide recommendations regarding how those clients "should vote on . . . shareholder proposals." *Nat'l Ass'n of Manufacturers ("NAM") v. SEC*, No. MO:22-CV-00163-DC, 2022 WL 17420760, at *1 (W.D. Tex. Dec. 4, 2022). PVABs also sometimes assist clients with the administrative details of the proxy voting process or even take the process over entirely, submitting votes without issue-specific approval from the client in a process sometimes referred to as "robo-voting." (Doc. No. 62 ¶ 6.)

The power of PVABs to affect corporate policy and governance is therefore considerable—particularly given that that power has been concentrated, in large part, among a small number of entities. According to the plaintiffs, "the PVAB industry is dominated by two firms, Institutional Shareholder Services (ISS) and Glass Lewis, which together control over 90% of the market." (*Id.* ¶ 5.) A 2018 study of "175 asset managers with more than $5 trillion in assets under management" found that those managers had "historically voted with ISS on both management and shareholder proposals more than 95% of the time." (Doc. No. 35-5 at 9 n.16.) Because of this influence, it is, according to one Delaware Vice Chancellor, not uncommon for "powerful CEOs [to] come on bended knee to Rockville, Maryland, where ISS resides, to

persuade the managers of ISS of the merits of their views about issues like proposed mergers, executive compensation, and poison pills." (Doc. No. 35-7 at 688.)

## B. The SEC's 2020 PVAB Rules

PVAB recommendations differ somewhat from traditional proxy solicitations in their purpose, but not in their subject matter or the risks that could arise from the inclusion of misleading or erroneous information. Accordingly, the SEC "has long considered Proxy Voting Advice to be 'solicitation'" and therefore potentially subject to, among other things, the SEC's demanding advance filing rule. *NAM*, 2022 WL 17420760, at *1. The SEC, however, has permitted PVABs to avoid filing and disclosure requirements by qualifying for certain "exemptions." *Id.* Many interested parties—particularly the registered companies who were frequently the subjects of PVAB advice—came to believe that the breadth of those exemptions and the lack of alternative controls had resulted in an environment of dangerously unreliable proxy voting advice. For example, Business Roundtable—which is a plaintiff in this case— conducted surveys of CEOs in 2013 and 2018 and found that "nearly every single respondent" had identified what the respondent claimed to be factual errors in PVAB recommendations. (Doc. No. 62 ¶ 10.)

In 2010, the SEC "issued a concept release that sought public comment about, among other things, the role and legal status of proxy advisory firms within the U.S. proxy system." (Doc. No. 35-12 at 47,416.) It hosted roundtables related to the issue in 2013 and 2018, and, in 2014, the staff of the SEC's Division of Investment Management and Division of Corporation Finance "issued a Staff Legal Bulletin . . . to provide guidance about the availability and requirements of [the] two exemptions to the federal proxy rules that are often relied upon by proxy advisory firms." (*Id.*) According to the SEC, it "carefully considered the feedback received

5

on these topics" in the context of an "extensive body of information, historical experience, and engagement" in order to chart a course for how to deal with the entities. (*Id.*)

On November 5, 2019, the SEC released a Notice of Proposed Rulemaking related to the treatment of PVABs under the agency's proxy voting rules. The Notice was published to the Federal Register on December 4, 2019. (Doc. No. 35-1 at 66,559; Doc. No. 62 ¶ 11.) The plaintiffs characterize the 2019/2020 proposed rule as "the culmination of a 10-year deliberative process spanning multiple presidential administrations." (Doc. No. 62 ¶ 12.) In support of the proposed rule, the SEC noted that, "[i]n recent years, registrants, investors, and others ha[d] expressed concerns about proxy voting advice businesses," particularly regarding "the accuracy and soundness of the information and methodologies used to formulate proxy voting advice businesses' recommendations as well as potential conflicts of interest that may affect those recommendations." (Doc. No. 35-1 at 66,520.) The Commission explained that it had a "strong interest in protecting . . . investors by ensuring that information provided by proxy voting advice businesses enables investment advisers to make informed voting determinations." (*Id.*) To that end, the Commission was "proposing amendments to the federal proxy rules . . . designed to enhance the accuracy, transparency of process, and material completeness of the information provided to clients of proxy voting advice businesses when they cast their votes, as well as amendments to enhance disclosures of conflicts of interest that may materially affect the proxy voting advice businesses' voting advice." (*Id.*)

The proposed rule allowed for a 60-day comment period following its publication in the Federal Register. Ultimately, 650 comments were submitted, and SEC staff held 84 meetings about the issue with interested parties. On September 3, 2020, the SEC adopted a modified version of the rule by a 3-1 vote. (Doc. No. 62 ¶¶ 15–16.) The SEC acknowledged that the

6

comments it had received demonstrated a "wide range of opinions and competing views about the most effective way to ensure that market participants, including users of proxy voting advice, have access to adequate information when making their voting decisions." (Doc. No. 35-2 at 55,107.) Those views included comments "argu[ing] that there was insufficient evidence of inaccuracies or other problems with proxy voting advice to justify regulation." (*Id.*) The SEC conceded, moreover, that "[r]esearch on the role of proxy voting advice businesses in proxy voting has . . . produced inconclusive results with respect to the quality of voting advice." (*Id.* at 55,123.) The agency nevertheless ultimately concluded that, "[r]egardless of the incidence of errors in proxy voting advice, . . . it [was] appropriate to adopt reasonable measures designed to promote the reliability and completeness of information available to investors and those acting on their behalf at the time they make voting determinations." (*Id.* at 55,107.)

Commissioner Herren Lee—the "no" vote on the final rule—remained unconvinced and issued a dissenting statement, arguing that the new PVAB regulations "would harm the governance process and suppress the free and full exercise of shareholder rights," while "add[ing] significant complexity and cost into a system that just [was not] broken." (Doc. No. 60-2 at 2.) Lee lamented that the SEC "still ha[d] not produced any objective evidence of a problem with proxy advisory firms' voting recommendations" and that it was adopting its new approach "in the face of overwhelming opposition from investors and fiduciaries." (*Id.* at 2, 7.) The other commissioners, however, were convinced by the case for regulation and voted accordingly.

The 2020 rules adopted a few different mechanisms for addressing the issues that the SEC and proponents of greater regulation had identified. First, the SEC "codif[ied] the Commission's interpretation that proxy voting advice generally constitutes a solicitation." (Doc.

No. 35-2 at 55,082.) In addition to that codification, the rules dictated that PVABs "would only be eligible for the exemptions" from the SEC's onerous advance filing requirements "if they met two [new] conditions." *NAM*, 2022 WL 17420760, at *1. The first of those conditions, sometimes known as the "conflict-disclosure condition," required a PVAB to "include certain conflicts-of-interests disclosures with [its] delivered" advice. *Id.* The second condition, known as the "notice-and-awareness" condition, required a PVAB to (1) make its advice available to the registered company at issue "at or prior to the time" the PVAB delivered that advice to its client or clients and (2) provide its clients "with a 'mechanism' by which they would 'become aware' of" any response by the company. *Id.* (citations omitted). Finally, the 2020 rules added some fresh supplemental guidance a new Note (e) to Rule 14a-9, stating that "the failure to disclose material information regarding proxy voting advice, 'such as the proxy voting advice business's methodology, sources of information, or conflicts of interest' could, depending upon particular facts and circumstances, be misleading within the meaning of the rule." (Doc. No. 35-2 at 55,121.)

The version of the notice-and-awareness condition that the SEC adopted has been revised somewhat since the Commission's original proposal. The original proposal had required a PVAB to share its advice with the company at issue in advance, allowing the company sufficient "time to review and provide feedback on the advice before it is disseminated to the [PVAB's] clients." (Doc. No. 35-1 at 66,531.) The final version of the rule—which permitted a PVAB to share its advice with the company being discussed simultaneously with, instead of prior to, the PVAB's providing that advice to clients—was, according to the SEC, intended to "address[] the concerns raised by commenters regarding the potential unintended consequences of" the rule, "including those related to timing and the risk of affecting the independence of the advice or diminishing

competition in the proxy voting advice business industry." (Doc. No. 35-2 at 55,112 (footnotes omitted).) The SEC explained that, in its view, "because [the final rule] does not require proxy voting advice businesses to adopt policies that would provide registrants with the opportunity to review and provide feedback on their proxy voting advice before such advice is disseminated to clients, the rule does not create the risk that such advice would be delayed or that the independence thereof would be tainted as a result of a registrant's pre-dissemination involvement." (*Id.* (footnote omitted).)

The SEC acknowledged that the new rules would impose a substantial burden on PVABs. Specifically, the agency "estimate[d] an annual total increase of 52,640 hours in compliance burden to be incurred by proxy voting advice businesses that would be subject to the amendments." (*Id.* at 55,149.) That number included a new "paperwork burden" of "2,845 hours per proxy voting advice business." (*Id.*) The SEC concluded that such burdens were nevertheless acceptable in light of the "importance of a properly functioning proxy system to investors and the capital markets." (*Id.* at 55,151.)

The SEC, in adopting the new rules, stated that it was "aware of the risk that introducing new rules into a complex system like proxy voting, which has evolved over many years in response to changes in the marketplace as well as the interests and needs of market participants, could inadvertently disrupt the system and impose unnecessary costs if not carefully calibrated." (*Id.* at 55,107.) In light of such challenges, the agency chose to allow a "transition period" until December 1, 2021 before treating compliance with the conflict-of-interest and notice-and-awareness conditions as mandatory. It stated, however, that it "welcome[d] early compliance." (*Id.* at 55,122.)

9

**C. The 2022 Revision**

Interested parties began to prepare for the new regime. The appropriate approach toward

PVABs, however, remained a hot topic, particularly in light of the fact that the SEC Chair who

had overseen the adoption of the 2020 rules was succeeded by a new Chair, Gary Gensler, in

2021. (Doc. No. 62 ¶ 25.) On June 1, 2021, Gensler released the following statement:

> In September 2019, the Commission issued an interpretation and guidance
> addressing the application of the proxy rules to proxy voting advice businesses.
> Last July, the Commission adopted amendments to Rules 14a-1(l),14a-2(b), and
> 14a-9 concerning proxy voting advice.
>
> I am now directing the staff to consider whether to recommend further regulatory
> action regarding proxy voting advice. In particular, the staff should consider
> whether to recommend that the Commission revisit its 2020 codification of the
> definition of solicitation as encompassing proxy voting advice, the 2019
> Interpretation and Guidance regarding that definition, and the conditions on
> exemptions from the information and filing requirements in the 2020 Rule
> Amendments, among other matters.

(Doc. No 35-16 at 2 (citations omitted).) On the same day, the SEC's Division of Corporation

Finance issued a statement that, in light of the Chair's directive, it would "not recommend

enforcement action to the Commission based on . . . the 2020 Rule Amendments during the

period in which the Commission is considering further regulatory action in this area."[1] (Doc. No.

35-14 at 2.)

On June 11, 2021, Gensler and members of his staff held a closed meeting with a number

of entities and groups that had opposed aspects of the 2020 rules, including the AFL-CIO, the

Council of Institutional Investors, the California Public Employees' Retirement System, the

Consumer Federation of America, Sinclair Capital, and T. Rowe Price. (Doc. No. 62 ¶ 28.)

---

[1] The legality of the SEC's suspension of enforcement of the rules against PVABs prior to new
rulemaking has been questioned in other litigation, but that issue is outside the scope of this case. The
court mentions the SEC's actions in this regard, not to endorse them or suggest any particular view of
their legality, but because the lack of enforcement of aspects of the 2020 rules is material to evaluating
the 2022 actions at issue in this case.

According to the SEC's later description of the meeting, the participants expressed "general opposition to the 2020 Final Rules" and "concerns about the costs associated with" compliance.[2] (Doc. No. 35-17 at 67,385–86 n.24.)

On November 17, 2021, the SEC elected to propose a new rule, and the proposal was published in the Federal Register on November 26, 2021. (Doc. No. 35-17 at 67,402; Doc. No. 62 ¶ 32.) The SEC stated that it was proposing the revision "in light of feedback from market participants on [the 2020] rules and certain developments in the market for proxy voting advice." (Doc. No. 35-17 at 67,383.) The agency explained:

> Since the Commission adopted the 2020 Final Rules, . . . institutional investors and other clients of PVABs have continued to express strong concerns about the rules' impact on their ability to receive independent proxy voting advice in a timely manner. Furthermore, PVABs have continued to develop industry-wide best practices and improve their own business practices to address the concerns that were the impetus for the 2020 Final Rules. Accordingly, we believe it is appropriate to reassess the 2020 Final Rules, solicit further public comment and, where appropriate, recalibrate the rules to preserve the independence of proxy voting advice and ensure that PVABs can deliver advice in a timely manner without ultimately passing on higher costs to their clients.

(*Id.* at 67,384.) The Commission explained that it was not proposing a "wholesale reversal of the 2020 Final Rules," but rather "tailored adjustments in response to concerns and developments." (*Id.*) "[P]roxy voting advice would remain a solicitation subject to the proxy rules," and "material misstatements or omissions of fact in proxy voting advice would remain subject to liability . . . ." (*Id.*) PVABs would also "continue to be subject to Rule 14a–2(b)(9)'s conflicts of interest disclosure requirements." (*Id.*)

_____

[2] There appears to have been some acrimony surrounding this meeting, which was perceived as secretive and troubling by some supporters of the 2020 rules, including the Chamber, which filed Freedom of Information Act requests regarding the meeting. (Doc. No. 62 ¶¶ 30–31.) The propriety and wisdom of the meeting, however, is not before the court, and the court notes that the subsequent SEC rulemaking acknowledged the meeting and the positions taken therein. It is, moreover, wholly undisputed in this case that some powerful parties opposed the 2020 amendments while other powerful parties supported them.

The notice-and-awareness requirement, however, would be eliminated, as would the 2020 guidance and the specific examples set forth in Note (e). (*Id.*) The SEC explained that "[t]he goal of the proposed amendments is to avoid burdens on PVABs that may impede and impair the timeliness and independence of their proxy voting advice and subject them to undue litigation risks and compliance costs, while simultaneously preserving investors' confidence in the integrity of such advice." (*Id.* at 67,384.)

The SEC required comments to be received by December 27, 2021—making for a 30-day comment period that, the plaintiffs point out, included most of the December holiday season. (*Id.* at 67,383.) According to non-binding "recommendations" published by the Administrative Conference of the United States, "[a]s a general matter, for '[s]ignificant regulatory action[s]' as defined in Executive Order 12,866, agencies should use a comment period of at least 60 days. For all other rulemakings, they should generally use a comment period of at least 30 days." (Doc. No. 62 ¶ 40.) The Administrative Conference recommendations acknowledge, however, that agencies may, "in appropriate circumstances, set shorter comment periods," in which case "they are encouraged to provide an appropriate explanation for doing so." (Doc. No. 35-30 at 3.) The relevant Executive Order defines "significant regulatory action" as follows:

> "Significant regulatory action" means any regulatory action that is likely to result in a rule that may:
>
> (1) Have an annual effect on the economy of $100 million or more or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities;
>
> (2) Create a serious inconsistency or otherwise interfere with an action taken or planned by another agency;
>
> (3) Materially alter the budgetary impact of entitlements, grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

(4) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in this Executive order.

Regulatory Planning and Review, 58 Fed. Reg. 51,735.

The plaintiffs argue that the 30-day comment period was also inconsistent with Congressional testimony that Gensler later gave in May of 2022, in which he stated that the Commission's policy was to provide at least 60 days from the time that a proposal was published electronically for interested parties to comment. (Doc. No. 35-31 at 8.) While the amendments were under consideration, the CEO of the American Securities Association and the Executive Vice President of the Chamber sent letters expressing concerns related to what they considered an inappropriately short comment period and urging that the period be extended. (Doc. Nos. 35-19, -20.) The SEC did not extend its deadline. (Doc. No. 62 ¶ 37.)

On the day that the proposed revision was released, Commissioner Hester M. Peirce of the SEC issued a dissenting statement. (Doc. No. 35-18.) Commissioner Peirce complained that the SEC "lack[ed] a sound basis for seeking to amend a brand new rule" and was instead merely changing course because "the political winds ha[d] shifted." (*Id.* at 2.) Commissioner Peirce suggested that "[a] more reasonable approach would be to commit to a retrospective review of the 2020 Final Rules after three or five years to evaluate their effectiveness." (*Id.*) Ultimately, the SEC received 61 comments in response to the proposed rule, and SEC staff held three meetings with outside groups about the proposal during or shortly after that period. (Doc. No. 62 ¶ 38.)

On December 22, 2021, the American Council for Capital Formation ("ACCF") issued a report entitled "Proxy Advisors Are Still a Problem: 2021 Proxy Season Analysis Shows Companies Continue to Report Similar Rate of Errors Despite Heightened Scrutiny." (Doc. No. 35-8 at 2.) The Report stated that "[a] search of the SEC's EDGAR database through September 8, 2021 found 50 examples of public companies filing supplemental proxy materials this proxy

13

season to correct the record regarding a proxy advisory firm vote recommendation," representing a "21% increase from the last proxy season." (*Id.* at 9.) Some of those supplementations involved alleged factual errors by PVABs, while others represented disputes regarding analysis or methodology. (*Id.* at 10.) The organization recommended that, in light of the ongoing nature of the problem and the "robust process" that had gone into the 2020 rulemaking, "the SEC should keep their rule and guidance intact and enforce it before considering further change." (*Id.* at 13.) The ACCF report was part of the administrative record considered by the SEC in the 2021/22 rulemaking effort. (*See* Doc. No. 26 at 3.)

On July 13, 2022, the SEC adopted the 2022 revisions, as proposed, by a 3-2 vote. The SEC explained, in the final rulemaking, that it had decided to "revisit[]" its previous "effort to balance competing policy concerns," particularly the tradeoffs between "facilitating more informed proxy voting decisions" and minimizing "adverse effects on the cost, timeliness, and independence of proxy voting advice." (Doc. No. 35-21 at 43,169-70.) The SEC concluded, in essence, that the notice-and-awareness condition imposed too great a burden on PVABs for too little benefit to investors or the functioning of the market. It noted that "the vast majority of PVABs' clients and investors that expressed views" had voiced concerns about the rules, which, the SEC said, supported the conclusion that the "potential informational benefits" of notice-and-awareness "do not sufficiently justify the risks" that the condition "pose[d] to the cost, timeliness, and independence of proxy voting advice on which many investors rely." (*Id.* at 43,175 & n.124.) In particular, the SEC noted concerns that the notice-and-awareness system "could jeopardize the independence of proxy advice as proxy advisory firms may feel pressure to tilt voting recommendations in favor of management more often, to avoid critical comments from companies that could draw out the voting process and expose the firms to costly threats of

14

litigation." (*Id.* at 43,175 n.118 (quoting Council of Institutional Investors, *Leading Investor Group Dismayed by SEC Proxy Advice Rules* (July 22, 2020)). In addition to issues of independence, the SEC cited concerns that the back-and-forth between PVABs and respondents imposed by notice-and-awareness could place burdens on investment advisors charged with evaluating all the competing claims, resulting in "significant delays in the already constricted proxy voting process." (*Id.*) The agency also explained, in detail, why it did not consider the ACCR study or other comparable efforts to be "persuasive indicators of systemic inaccuracies in proxy voting advice." (*Id.* at 43,175 n.127.)

The SEC raised doubts about whether notice-and-awareness was necessary in order for companies to be able to respond to PVAB advice. It noted that many registered companies had been able to respond to allegedly deficient voting advice, even without the benefit of PVABs' compliance with the 2020 rules. (*Id.* at 43,176.) As the SEC had explained when it proposed rescinding notice-and-awareness, Glass Lewis and ISS facilitated such feedback through their own voluntary policies, such as Glass Lewis' policy of "provid[ing] registrants with an opportunity to review and respond to its proxy voting advice after it has been disseminated to its clients pursuant to its Report Feedback Service (the 'RFS')." (Doc. No. 35-17 at 67,386.) ISS had also historically "allow[ed] any registrant to request a copy of its proxy voting advice free of charge after such advice has been disseminated to ISS' clients." (*Id.* as 67,386–87.)

The SEC, citing all of the aforementioned reasons, eliminated the notice-and-awareness condition. It also eliminated Note (e), explaining that "PVABs, their clients, and other investors have asserted that, instead of clarifying the application of Rule 14a–9 to proxy voting advice, Note (e) has in fact heightened legal uncertainty, particularly with respect to PVABs' statements of opinion . . . ." (Doc. No. 35-21 at 43,181.) The SEC wrote that it ultimately agreed, "[i]n

15

retrospect, . . . that Note (e) has created a risk of confusion regarding the application of Rule 14a–9 to proxy voting advice," such that deleting the note was "appropriate." (*Id.*) Finally, the revisions rescinded guidance that had accompanied the 2020 rule. (Doc. No. 62 ¶ 44.)

## C. This Case

On July 28, 2022, the plaintiffs filed a Complaint asking this court to set aside the 2022 amendments on the ground that they were adopted in violation of the Administrative Procedure Act ("APA"). (Doc. No. 1.) The Complaint states six counts. Count I is based on the allegation that the SEC failed to provide an adequate opportunity for comment, in violation of 5 U.S.C. § 553. (*Id.* ¶¶ 126–33.) The remaining counts—Counts II through VI—involve partially overlapping arguments that the SEC's 2022 rulemaking was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of 5 U.S.C. § 706(2)(A). Count II is based on the allegation that the 2022 amendment was "not in accordance with law" because the SEC failed to perform a mandatory consideration of the proposed rule's effects on "efficiency, competition, and capital formation," 15 U.S.C. § 78c(f). (*Id.* ¶¶ 134–41.) Count III is based on the allegation that the SEC failed to "articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted). (*Id.* ¶¶ 142–52.) Count IV is based on the allegation that the SEC failed to provide "enhanced justification" for its decision, in light of the fact that it was departing from a prior rulemaking. (*Id.* ¶¶ 153–58.) Count V is based on the allegation that the SEC failed to give adequate consideration to alternative courses of action. (*Id.* ¶¶ 159–66.) Count VI is based on the allegation that the SEC failed to provide a sufficient explanation of why it was treating PVABs differently from other regulated parties. (*Id.* ¶¶ 167–77.) Similar arguments were raised in another challenge to the 2022 rules, *NAM v. SEC*, No., 2022 WL 17420760, in which the District

Court for the Western District of Texas granted summary judgment in favor of the SEC. *Id.* at *8. An appeal of that decision is pending.

<h2 align="center">II. LEGAL STANDARD</h2>

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To win summary judgment as to the claim of an adverse party, a moving defendant must show that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim. Once the moving defendant makes its initial showing, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Conversely, to win summary judgment as to his own claims, a moving plaintiff must demonstrate that no genuine issue of material fact exists as to all essential elements of its claims.

Although the ordinary Rule 56 standard governs this case, the application of that standard is shaped by the fact that, "when a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal," not a forum of first impression. *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (citations omitted). Accordingly, the parties' task is ordinarily not to produce a new factual record relevant to the questions at issue in the underlying agency proceedings. Rather, "[t]he entire case on review is a question of law, and only a question of law," to be based on the administrative record already assembled. *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993).

## II. ANALYSIS

Under the APA, a party that opposes a final agency action may file a cause of action seeking to have a federal district court "hold [that action] unlawful and set [it] aside." 5 U.S.C. § 706(2). The permissible grounds for doing so, however, are limited. The court must defer to the lawful policymaking authority of the relevant agency unless the challenged action was:

> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (B)  contrary to constitutional right, power, privilege, or immunity;
>
> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>
> (D) without observance of procedure required by law;
>
> (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>
> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

*Id.*

"Under this 'narrow standard of review, . . . a court is not to substitute its judgment for that of the agency.'" *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1905 (2020) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009)). Nevertheless, if consideration of one or more of the enumerated grounds for judicial review reveals that the agency made a "clear error of judgment," the court may set the agency's action aside. *Id.* (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416] (1971)). The plaintiffs identify six such alleged grounds for setting the 2022 rules aside in this case, and the court will consider each alleged error in turn.

18

## A. Adequate Opportunity to Comment (Count I)

Count I is based on the plaintiffs' assertion that the 2022 rules were adopted "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). "General notice of proposed rule making" must "be published in the Federal Register," after which "the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(a), (c). That requirement—typically referred to as "notice-and-comment"—applies not only to the initial promulgation of a rule (as occurred, in this instance, in 2020) but also any "amendment, modification, or repeal" of a rule, unless an exception applies. *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1044 (D.C. Cir. 1987). It is undisputed that the proposed 2022 rules were subject to notice-and-comment and were published in the Federal Register prior to their adoption, but the plaintiffs argue that the ensuing comment period was insufficient.

The APA notice-and-comment framework requires that the public's opportunity to comment be a "meaningful" one, but it does not set a specific minimum comment period or provide a formula for calculating the appropriate period for any particular action. *Rural Cellular Ass'n v. F.C.C.*, 588 F.3d 1095, 1101 (D.C. Cir. 2009). While the Administrative Conference of the United States has, as the plaintiffs point out, provided recommendations regarding comment periods, that guidance is "general" and not legally binding. (Doc. No. 35-30 at 3.) A number of courts have suggested that, "[w]hen substantial rule changes are proposed, a 30-day comment period is generally the shortest time period sufficient for interested persons to meaningfully review a proposed rule and provide informed comment." *Nat'l Lifeline Ass'n v. F.C.C.*, 921 F.3d 1102, 1117 (D.C. Cir. 2019) (citing *Prometheus Radio Project v. F.C.C.*, 652 F.3d 431, 453 (3d Cir. 2011); *Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984)); *see also Azar v. Allina Health*

19

*Servs.*, 139 S. Ct. 1804, 1809 (2019) (referring to the "APA minimum of 30 days"). A 30-day comment period, however, is neither necessarily required nor necessarily sufficient. Shorter periods have sometimes been held to have been appropriate when quick action was justified by the underlying situation. *See, e.g.*, *Omnipoint Corp. v. FCC*, 78 F.3d 620, 629–30 (D.C. Cir. 1996) (7 days); *Northwest Airlines, Inc. v. Goldschmidt*, 645 F.2d 1309, 1321 (8th Cir. 1981) (7 days). In other instances, however, periods around 30 days—and even, on occasion, longer than 30 days—have been held to be insufficient in light of the complexity of the issues involved and the practical difficulties imposed by the underlying situation. *See, e.g.*, *Centro Legal de la Raza v. Exec. Office for Immigration Review*, 524 F. Supp. 3d 919, 954-962 (N.D. Cal. 2021) (30-day period inadequate); *Estate of Smith v. Bowen*, 656 F. Supp. 1093, 1099 (D. Colo. 1987) (60-day period inadequate). The court must base its determination on the nature and complexity of the policy change at issue and the circumstances surrounding the proposal, rather than a fixed schedule of what is or is not a sufficiently lengthy period.

The plaintiffs argue that the 30-day comment period, which included the weekend after Thanksgiving as well as the Christmas holiday, was an inappropriately short period of time in this instance, particularly considering that (1) the original rule had a 60-day period that yielded far more comments, (2) the SEC's stated ordinary practice, like the Administrative Conference's recommendations, calls for significant rule changes to have at least a 60-day period, and (3) interested parties affirmatively requested that the comment period be extended. The SEC responds that 30-day comment periods have been frequently held to be sufficient, even for significant rule changes, with longer periods typically being required only in cases in which unusual complexity or other special factors justified a longer period. The SEC points out that the plaintiffs have only been able to identify a handful of cases in which a court actually found 30

days to have been inadequate, and that, in many of those cases, the court based its conclusion on unique procedural and/or substantive complications that are not present here. *See, e.g., California ex rel. Becerra v. United States Dep't of the Interior*, 381 F. Supp. 3d 1153, 1177 (N.D. Cal. 2019) (finding 30-day period inadequate in light of *de facto* "content restriction" limiting nature of comments permitted).

The court finds the SEC's decision to rely on such a short comment period, over the objections of interested parties and in apparent departure from much of the agency's usual practice, to be somewhat troubling. *See Estate of Bowen*, 656 F. Supp. at 1099 (finding 60-day period inadequate in light of, among other things, the agency's "failure to extend that period pursuant to the numerous requests to do"). The contrast between the 2020 comment period and the 2022 comment period adds to the court's concern. *See Becerra*, 381 F. Supp. 3d at 1177 ("In cases involving the repeal of regulations, courts have considered the length of the comment period utilized in the prior rulemaking process as . . . well as the number of comments received during that time-period."). Under the APA, however, the court's task is not to consider whether there was a vague air of haste or unfairness around an agency's choice of comment period. The court's job, rather, is merely to consider whether the period selected was sufficient to allow a meaningful opportunity to comment based on the underlying circumstances. The plaintiffs, however, have done very little to establish that the 30-day period was actually inadequate, particularly in light of the years of analysis that had already been devoted to these issues before the 2022 revision was proposed.

Indeed, the plaintiffs' own briefing, in its efforts to demonstrate the unusualness of the 2022 about-face, makes an overwhelming case that the parties on all sides of these issues were well-prepared to comment quickly and effectively on any proposed rollback. The plaintiffs

highlight the "decade-long, . . . extensive process" that ultimately "culminated" in the 2020 rule. (Doc. No. 33 at 8.) They point to evidence, such as the 2022 ACCF report, confirming that proponents of strict regulation of PVABs followed these issues assiduously both before and after the adoption of the 2020 rule. And, of course, the plaintiffs frequently remind the court of the robustness and thoroughness of the 2020 process. That robust process, however, meant that numerous detailed arguments in favor of and against the notice-and-awareness condition had already been assembled. The plaintiffs, moreover, have stressed how little had changed between 2020 and 2022—which, although it may cast doubt on the substantive basis for the 2022 rescission, also confirms that the interested parties had little need to formulate arguments from scratch. That is particularly true given that, even though the formal comment period was only 30 days, the proposed rule was actually published earlier, and the SEC had given hints that it might revisit the 2020 rules even before that. *See Omnipoint*, 78 F.3d at 629 (holding that it can be relevant to the adequacy of a comment period that opponents "had actually received notice prior to the . . . date when the proposed federal regulations were published in the Federal Register").[3]

A 30-day period was therefore within the bounds of what was legally permissible. As the Western District of Texas wrote in *NAM*, treating that permissible comment period as grounds for setting aside the regulation merely because the court is uneasy with the agency's approach would amount to substituting the court's "own policy preferences" from those of the duly powered administrators. *NAM*, 2022 WL 17420760, at *7. A 30-day period may have been unnecessarily short or even frustratingly short, but that does not mean that it was impermissibly

---

[3] The court stresses that its analysis remains focused on whether the comment period following formal publication in the Federal Register was adequate. Plaintiffs' prior knowledge of the proposal does not change the fact that the statutory comment period runs from the date of publication in the Register. The court does, however, find the plaintiffs' forewarning to be relevant to the sufficiency of the ensuing 30-day period, because that forewarning is one fact of many that bears on a holistic analysis of how much time was required, as a practical matter, to respond effectively. The court, however, would ultimately reach the same conclusion that it has reached, regardless of whether that forewarning occurred.

short. The evidence in the record suggests that 30 days was a sufficient period of time for commenters to formulate and provide their views on the proposal, which is what the APA requires. The court accordingly will grant summary judgment on Count I to the defendants.

## B. Consideration of Efficiency, Competition, and Capital Formation (Count II)

The plaintiffs allege, in Count II, that the 2022 rules were adopted in a manner "not in accordance with law," 5 U.S.C. § 706(2)(A), because the SEC failed to comply with the Exchange Act's requirement that, "[w]henever . . . the Commission is engaged in rulemaking . . . and is required to consider or determine whether an action is necessary or appropriate in the public interest, the Commission shall . . . consider . . . whether the action will promote efficiency, competition, and capital formation." 15 U.S.C. § 78c(f). That provision requires the SEC "to do what it can to apprise itself—and hence the public and the Congress—of the economic consequences of a proposed regulation before it decides whether to adopt the measure." *Chamber of Com. of U.S. v. SEC*, 412 F.3d 133, 144 (D.C. Cir. 2005). The plaintiffs argue that the SEC's "hasty economic analysis" in support of the 2022 rule amounted to a "textbook violation" of that requirement. (Doc. No. 33 at 25.) In particular, the plaintiffs note that the SEC's analysis purporting to support the repeal of aspects of the 2020 rules was less than a quarter of the length of the analysis that the SEC had relied on when it adopted those rules in the first place. This truncated analysis, the plaintiffs argue, "focuse[d] entirely on the purported benefits to PVABs' profitability, while ignoring the significant costs to companies and shareholders." (*Id.*)

The plaintiffs, however, have not identified any reason why the 2022 analysis, in order to be sufficiently thorough, would need to even approach the considerable length of the 2020 analysis. The 2022 analysis, by definition, did not involve the SEC's first foray into significant

regulation of PVABs. It involved, rather, the targeted reconsideration of one mechanism of regulation. It is unremarkable that it would, therefore, include significantly less background discussion. As the SEC explained, its decision to repeal the notice-and-awareness condition was not, fundamentally, based on a belief that economic realities had shifted in some way that would require regulators to start over from square one. The SEC noted some new information, but it did not suggest that its earlier analysis was entirely obsolete. Rather, the SEC, based at least in part on investor feedback, revised the conclusion it had reached about how best to balance the incommensurable policy tradeoffs at issue.

The fact that notice-and-awareness had substantial compliance burdens was not something that needed to be proven as a matter of first impression. The 2020 analysis itself had already acknowledged those concerns. (*See, e.g.*, Doc. No. 35-1 at 66,553 to -55; Doc. No. 35-2 at 55,137 ("We recognize the concerns raised by these commenters regarding compliance costs associated with the proposed registrant review and response process."). Indeed, one Commissioner was already convinced, in 2020, that the compliance burdens associated with notice-and-awareness outweighed the new rules' benefits, and the rules were adopted by a divided Commission. That does not absolve the SEC of its obligation to analyze the underlying issues again in 2022. It does, however, highlight why the SEC's analysis could be shorter than it had been in 2020.

It is, moreover, simply not true that the 2022 rulemaking ignored the downside of repealing the notice-and-awareness condition. For example, in adopting the 2022 rules, the SEC wrote:

> Requiring PVABs to provide registrants with proxy voting advice no later than the time that they disseminate such information to their clients could allow registrants to more effectively determine whether they wish to respond to a recommendation by publishing additional soliciting materials and to do so in a

24

timely manner before shareholders cast their votes. Registrants may wish to do so for a variety of reasons, including, for example, because they may identify what they perceive to be factual errors or methodological weaknesses in a PVAB's analysis or have a different or additional perspective with respect to the advice. In either case, clients of PVABs, and registrants' investors in general, might have benefited from the availability of additional information on which to base their voting decisions. Clients of PVABs often must make voting decisions in a compressed time period. Timely access to registrant responses to proxy voting advice could facilitate a client's evaluation of the advice by highlighting disagreements regarding facts and data, differences of opinion, or additional perspectives before the client casts its votes. To the extent that the amendments reduce this type of information and it is valuable to investors, the amendments may make it more costly for investors to obtain such information and make timely voting decisions.

(Doc. No. 35-21 at 43,187.) That explanation of why a policymaker could support the notice-and-awareness condition is so clear that it might as well have come from the plaintiffs themselves. The SEC did not ignore or understate these points; it simply was not persuaded by them, and it explained why and how that could be the case.

The SEC noted that the economic analyses associated with the 2020 rules and 2022 rescission were both "primarily qualitative in nature," meaning that it was not possible simply to compare two sets of numbers to determine which had a higher net benefit. (*Id.* at 43,185.) Rather, the record before the agency gave it no choice but to "engage in a qualitative analysis." (*Id.* at 43,186.) That qualitative analysis was debatable in 2020, when the Commissioners divided in favor of one approach, and in 2022, when they divided in favor of the other approach. There is nothing inherently suspect, or even remarkable, about that. The plaintiffs, moreover, have not identified any superior approach that would have removed the uncertainty inherent in such a qualitative analysis. Indeed, if the 2020 process demonstrated anything, it would seem to be that no length of time and no number of pages can put these issues beyond the realm of disagreement.

Counts III and IV, which the court will discuss in the next section, are more holistically focused on the sufficiency of the SEC's explanation of its analysis, and many of the arguments that the plaintiffs have raised in connection with Count II are relevant to those claims as well. On the question of whether the SEC substantively complied with 15 U.S.C. § 78c(f), however, the SEC is entitled to summary judgment. Nothing about 15 U.S.C. § 78c(f) required the SEC to forget that its earlier analysis ever happened and painstakingly assemble a new record of equal length. The agency was required only to "consider . . . whether the action w[ould] promote efficiency, competition, and capital formation," just as it had in 2020. The fact that the Commission reached a different conclusion in 2022 and therefore ultimately endorsed a different policy does not negate the fact that such an analysis occurred. The court will therefore grant the SEC summary judgment as to Count II.

**C. General Sufficiency of the SEC's Justification (Counts III and IV)**

"One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). In so doing, [t]he agency 'must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Id.* (quoting *State Farm*, 463 U.S. at 43). Pursuant to this "narrow" standard of review, "[a] reviewing court must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment,'" but "[t]he court is not empowered to substitute its judgment for that of the agency." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974) (quoting *Volpe*, 401 U.S. at 416). "Even when an agency explains its decision with less than ideal clarity, a reviewing court will not upset the decision on that account if the agency's path may reasonably be

26

discerned." *Oakbrook Land Holdings, LLC v. Comm'r of Internal Revenue*, 28 F.4th 700, 720 (6th Cir. 2022) (quoting *Ne. Ohio Reg'l Sewer Dist. v. U.S. E.P.A.*, 411 F.3d 726, 731 (6th Cir. 2005)). Counts III through VI all present arguments pursuant to this standard of review.

Counts V and VI involve relatively discrete alleged errors, which the court will consider in the coming sections. Counts III and IV, however, focus more generally on the overall sufficiency of the SEC's explanation for its 2022 action. Each of those two counts is based on the premise that the SEC's 2022 justification was too cursory—and engaged with arguments in favor of keeping the 2020 rules too superficially—to support final rulemaking. The difference between Count III and Count IV hinges on a question of law—namely, whether the relationship between the 2020 and 2022 rules required the SEC to clear a higher bar in its explanation.

"Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars*, 579 U.S. at 221 (collecting cases). In the past, however, some federal circuits had held that, if a proposed agency action "changes prior policy," then it must be supported by a "more substantial explanation" than would have been necessary if the agency had been acting on a blank slate. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009). The Supreme Court ultimately rejected that general rule in *FCC v. Fox Television Stations, Inc.*, observing that there is no basis in the text of the APA for imposing a different standard of review for revisions of rules, as opposed to completely new rules. *Id.* The Court recognized, however, that, based on the details of specific circumstances, an agency's decision to depart from an earlier agency action might still need to be addressed in order for the agency's justification of its action to be complete. For example, "[i]t would be arbitrary or capricious to ignore" the fact that the "new policy rests upon factual findings that contradict those which underlay its prior policy" or to fail to account for the reliance interests of parties

who had operated under the older rule. *Id.* at 515 (citing *Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 745 (1996)). That is not because of a heightened APA standard for such situations *per se*, but because the APA requires an agency to address the material considerations surrounding its decision, and sometimes the fact that an older rule or conclusion will be disregarded is a material consideration.

The SEC argues that this is not a situation calling for any heightened showing by the SEC, because (1) there was little, if any, time for any party to develop a reliance interest on the 2020 rules and (2) the SEC has not contradicted any of its earlier factual findings. The argument regarding reliance interests is persuasive. The 2020 rules had little time to engender reliance, and, as the SEC observed, commenters who objected to the 2022 rescission "did not present evidence that registrants ha[d] incurred significant costs or significantly altered existing practices in reliance on the conditions." (Doc. No. 35-21 at 43,177.) The assertion that the SEC did not contradict its earlier factual findings, however, is only true if the court excludes, from its definition of "factual," any conclusions that the SEC reached in its balancing of the various costs and benefits associated with the notice-and-awareness condition. Such an approach, however, would be inconsistent with the SEC's own reasoning, which unambiguously characterized the 2022 decision as arising, at least in part, out of changes in the agency's understanding of the relevant factual circumstances. The SEC acknowledged that its "thinking ha[d] evolved" based, in part, on "the concerns expressed by PVABs' clients and other investors that were among the primary intended beneficiaries of the 2020 Final Rules." (*Id.* at 43,169) The agency cited that feedback from institutional investors as convincing it of a need to "reassess the 2020 Final Rules, solicit further public comment, and, where appropriate, recalibrate the rules to preserve the independence of proxy voting advice and ensure that PVABs can deliver advice in a timely

manner without passing on higher costs to their clients." (Doc. No. 35-21 at 43,169.) The changes in the SEC's conclusions may not have been easily *quantifiable*—because they involved abstract and speculative tradeoffs—but the changes were, by the SEC's account, at least partly based on a reevaluation of the facts. The plaintiffs are correct that such changes in the SEC's understanding of the underlying situation gave rise to an obligation to explain why and how the agency's thinking had changed.

It is important, though, not to overstate the additional burden that the APA imposes on the SEC based on the fact that it was reversing course from earlier conclusions, as opposed to starting wholly anew. As the Supreme Court explained in *Fox*, this is not a case of arbitrary-and-capricious versus arbitrary-and-capricious-plus, but rather an application of the same, well-developed standard of a review to a particular factual situation that happens to require some extra explanation. The Supreme Court recognized in *Fox* that, when an agency contradicts its earlier conclusions, that contradiction is among the many things that the agency must address in order for the challenged action to be adequately supported and therefore not arbitrary and capricious. *See Fox*, 556 U.S. at 515 ("An agency may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books.") (citing *United States v. Nixon*, 418 U.S. 683, 696 (1974)). The plaintiffs have demonstrated that such considerations come into play here and that the SEC had an obligation to explain why it changed its conclusions. At the same time, however, the court's review remains narrow and deferential. The SEC was not obligated to thoroughly debunk its earlier reasoning or persuade the court that its second course of action was the better of the two.

Nor was the SEC required to assemble a record equal in size to the earlier record. The plaintiffs frequently cite the relative size of the two records to give the impression that the SEC

was, in essence, using a molehill to repeal a mountain. As the court has already explained, however, the depth and thoroughness of the 2020 record is, if anything, part of the explanation for why the 2022 record was as short as it was, not a reason that it should have been longer. The 2020 record included, among other things, many pages of straightforward background information that, while it may have been necessary to explain the role of PVABs to an uninitiated layperson, did not need to be repeated in order for the 2022 policy analysis to be sufficiently thorough.

None of the foregoing necessarily establishes that the SEC's justification of the 2022 rules was sufficient. All it means is that the basic form that the 2022 justification took—an acknowledgment of the earlier process accompanied by a comparatively targeted focus on the reasons for making a change to some, but not all, of the earlier policy—was not inherently defective. The court, accordingly, must turn to the more specific alleged deficiencies that the plaintiffs have identified.

In addition to the specific alleged deficiencies addressed in Counts V and VI (and the general structural issues that the court has already addressed), the plaintiffs identify two primary ways in which the 2022 justification was, supposedly, substantively deficient. First, the plaintiffs allege that the SEC failed to explain why the concerns raised by PVABs and their clients in connection with the 2020 rules were more persuasive in 2022. (Doc. No. 33 at 20–22.) Second, the plaintiffs allege that the SEC failed to explain why it had become more convinced of the efficacy of PVAB self-regulation, given that those issues, as well, had been raised in connection with the 2020 rulemaking. (*Id.* at 22–24.) Each argument, in essence, depends on the assumption that the SEC was required not simply to explain why it departed from its earlier path, but to

convincingly refute its earlier conclusions—as if it was not merely making a different choice, but correcting an error or proving its earlier analysis obsolete.

The Supreme Court has been clear, however, that "[a]n agency's view of what is in the public interest may change, either with *or without* a change in circumstances." *Motor Vehicle Mfrs.*, 463 U.S. at 57 (quoting *Greater Bos. Television Corp. v. F.C.C.*, 444 F.2d 841, 852 (D.C. Cir. 1970)) (emphasis added). Policymaking inherently involves both uncertainty (in that the policymaker does not know how a policy will play out) and incommensurability (in that the policymaker is forced to weigh qualitatively different harms and benefits against each other, despite the fact that there is no neutral or objective way to compare them). Dealing with both of those obstacles requires the exercise of judgment, and the APA and authorizing statutes commend that judgment to the executive branch, not the courts. The SEC was required to explain how and why it was acting in the way that it was, but it was not required to try to create the comforting illusion that its course of action was the only defensible one. Both rulemaking and judicial review would certainly be easier if all regulatory decisions could be purged of the need to exercise discretion in the face of ambiguity, but, most of the time, they cannot. At some point, in any difficult policy decision, the policymaker must make a choice that cannot be easily and prospectively reduced to a correct answer and an incorrect one. Because of that irreducible need for the exercise of judgment, an agency that changes its policies is not required to "demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better . . . ." *Fox*, 556 U.S. at 515.

The justification accompanying the 2022 rulemaking explained that the SEC had decided to step back from its earlier position because it was concerned that the notice-and-awareness

procedures might, among other things, "jeopardize the independence of proxy advice as proxy advisory firms may feel pressure to tilt voting recommendations in favor of management more often, to avoid critical comments from companies that could draw out the voting process and expose the firms to costly threats of litigation." (Doc. No. 35-21 at 43,175 (quoting Council of Institutional Investors, *Leading Investor Group Dismayed by SEC Proxy Advice Rules* (July 22, 2020)). It also explained its concerns that the costs borne by PVABs would be "pass[ed] . . . on to their clients." (*Id.* at 43,189.) Those issues had been raised in 2020, but they did not cease to exist simply because more members of that iteration of the SEC's 2020 leadership had been more persuaded by the counterarguments.

The 2022 leadership of the SEC, moreover, did not pretend that the counterarguments that had won the day in 2020 had gone away. The agency acknowledged, for example, that eliminating notice-and-awareness could also "potentially reduc[e] the overall mix of information available to those clients as they assess proxy voting advice and make determinations about how to cast their votes." (*Id.*) The agency fully identified and explained the concerns on both sides of the issue and set forth its conclusion regarding which was more persuasive. That conclusion was not irrefutable, but neither was the conclusion reached in 2020.

Similarly, the plaintiffs' characterization of the 2022 rulemaking as reflecting a blind faith in self-regulation cannot be squared with the record itself. The SEC considered arguments that PVABs' "voluntary practices" would be insufficient in the wake of a repeal of notice-and-awareness, and it acknowledged that questions about the efficacy of such self-regulation meant that the agency would need to "continue to monitor the PVAB market to help ensure that investors are adequately protected and have ready access to information that allows them to make informed voting decisions." (*Id.* at 43,188.) The agency admitted that it "cannot know for

sure whether [the PVABs'] voluntary practices will continue." (Doc. No. 35-21 at 43,188.) The agency explained, however, that it was not basing its view on a naïve expectation that PVABs would regulate themselves out of the goodness of their hearts. Rather, "PVABs have market-based incentives to maintain the[] practices" at issue. (*Id.*) As the SEC explained, "the perpetuation of material errors in proxy voting advice would reduce the quality and usefulness of such advice, which, in the long-term, would reduce a PVAB's credibility in the market." (*Id.* at 43,177.) PVABs' maintaining open lines of communication with the companies discussed in PVAB advice, the SEC observed, has the capacity to benefit both the companies and the PVABs, particularly given that the 2022 rescission did not remove PVABs' potential liability for errors. That fact, the SEC ultimately concluded, undermined the case that mandatory disclosure or cooperation was necessary. One can, of course, be skeptical of that argument; the SEC itself was in 2020. All that the APA requires, though, is that the argument be capable of justifying the agency's conclusion and sufficiently supported by the record. That was the case here.

The plaintiffs' arguments that the 2022 rescission involved something more than coming down on a different side of a difficult set of questions, moreover, relies on a highly selective reading of the record. Indeed, the centerpiece of the plaintiffs' argument——what they refer to as the "most notabl[e]" of the SEC's alleged reversals—relies on truncating a sentence in a way that renders the plaintiffs' account not only incomplete but misleading. This is what the plaintiffs say happened:

> Most notably, the 2020 Rule found that the Review and Notice Conditions would "not create the risk that [proxy voting] advice would be delayed or that the independence thereof would be tainted." But the 2022 Rule reached the opposite conclusion, namely, that the "risks posed . . . to the cost, timeliness, and independence of proxy voting advice are sufficiently significant such that it is appropriate to rescind the conditions now."

(Doc. No. 64 at 6 (citations omitted.) This, though, is what the SEC actually said in 2020:

33

Specifically, because Rule 14a–2(b)(9)(ii) does not require proxy voting advice businesses to adopt policies that would provide registrants with the opportunity to review and provide feedback on their proxy voting advice *before such advice is disseminated to clients*, the rule does not create the risk that such advice would be delayed or that the independence thereof would be tainted *as a result of a registrant's pre-dissemination involvement.*

(Doc. No. 35-2 at 55,112.) The SEC was explaining that, unlike the original proposed rule, the revised rule would not cause delays "as a result of a registrant's pre-dissemination involvement" because the revised version did not *require* the registration's pre-dissemination involvement—only a contemporary disclosure followed by an obligation to pass along any response. The plaintiffs, however, omit the final eight words of the relevant sentence in order to create the false impression that the SEC was suggesting that notice-and-awareness posed no risks whatsoever of causing delays or compromising independence for any reason. That, though, is not what the SEC said, and it was, accordingly, not something that the SEC needed to repudiate.

In 2022, the SEC acknowledged the arguments for and against its proposed course of action and explained why, on balance, it preferred one option to the other. The plaintiffs nevertheless insist that the SEC should have done more—issued more pages of analysis or asserted more aggressively that its prior analysis was unacceptably flawed. The court, however, finds very little reason to think that the plaintiffs' preferred approach would actually result in better or more transparent rulemaking. Rather, to satisfy the standard implicit in the plaintiffs' arguments, an agency would have to engage in two types of empty theater that would, if anything, obfuscate matters. First, the agency would have to bloat its rulemaking with as much surplus verbiage and tedious background as possible, to avoid repealing a rule with a record that the plaintiffs would consider to be suspicious merely because it was shorter than the previous one. Second, the agency would have to pretend—falsely—that it only ever changes policy when

34

new evidence undeniably refutes its prior reasoning. The Exchange Act, though, does not require that, and neither does the APA.

If anything, an agency's admission that it is exercising its policymaking discretion, rather than simply taking the only course allowed by the facts, is far more in keeping with the values of transparency and candor than the alternative. A world in which an agency goes excessively through the motions to create the biggest record possible, then pretends that its conclusion was absolutely mandated by the facts of the moment, would not be a world in which agencies were better at their jobs, more accountable, more transparent, or more meaningfully constrained by the public interest. It would just be a world in which rulemaking involved more paperwork and more bluster, to no positive effect. The court sees no reason to embrace such an approach if neither the APA nor the caselaw requires it.

The Western District of Texas, mirroring language from Commissioner Peirce's dissenting statement, observed that, "[l]ike it or not, changing political winds may factor into an agency's policy preference." *NAM*, 2022 WL 17420760, at *8. The question of which way any "political winds" were blowing at any given time is beyond this court's knowledge. The Western District's statement, however, correctly identifies what this case actually is about: a change in the SEC's policy preference, plain and simple. The SEC did not provide a record showing that its 2020 reasoning had been definitively debunked, because that is neither what happened nor what was required to happen for the SEC to act. Rather, the SEC reconsidered a matter and came down on a different side of a debatable question, which it was permitted to do, and then it explained that decision clearly and thoroughly, as was required. Because the SEC explained in sufficient scope and detail why it concluded that the 2022 policy was preferable, it satisfied the

35

general APA obligations at the heart of Counts III and IV. The court accordingly will grant the defendants summary judgment on those counts.

## D. Failure to Consider Viable Alternatives (Count V)

Courts have long held that "an agency rule [is] arbitrary and capricious if the agency . . . entirely failed to consider an important aspect of the problem" at hand. *Motor Vehicle Mfrs.*, 463 U.S. at 43. One important aspect of any regulatory problem is the question of what policy options are available to the agency. Accordingly, while an agency is not required to consider "every alternative device and thought conceivable by the mind of man," *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 551 (1978), it must give some consideration to "'significant and viable' and 'obvious' alternatives" to the policy it ultimately selects. *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013) (quoting *City of Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153, 1169 (D.C. Cir. 1987); citing *City of Alexandria, Va. v. Slater*, 198 F.3d 862, 867–68 (D.C. Cir. 1999);). The Supreme Court has held that, when an agency is deciding whether or not to rescind a policy, that principle requires it to consider whether it might instead pursue its objectives adequately "within the ambit of the existing [policy]." *Regents*, 140 S. Ct. at 1913 (quoting *State Farm*, 463 U.S. at 51). This issue differs, albeit slightly, from the matters raised in connection with Counts III and IV, because it does not involve simply the agency's choice between its old policy and a proposed new policy. Rather, the agency must consider the possibility that the old policy might be bent, through its implementation, to serve the new policy's aims without requiring actual rescission. The plaintiffs argue that the SEC violated that requirement by failing to adequately address the suggestion, by Commissioner Peirce, to allow the 2020 rules to go into effect while "commit[ting] to a

36

retrospective review of the [rules] after three or five years to evaluate their effectiveness." (Doc. No. 35-18 at 2.)

The plaintiffs' argument that the SEC failed to consider this proposed alternative, however, is mostly an issue of semantics. It is true that the SEC, for the most part, did not discuss the possibility of a delay accompanied by a commitment to retrospective review as an alternative "policy." The SEC did, however, acknowledge that delay and review had been suggested, and it included a significant, meaningful discussion of why it was forgoing any such delay:

> Some commenters asserted that it was inappropriate for the Commission to propose amendments to Rule 14a–2(b)(9) before that rule had gone into effect. To the contrary, we believe it is appropriate to proceed expeditiously to rescind the Rule 14a–2(b)(9)(ii) conditions rather than wait until the risks those conditions pose materialize and investors are harmed. This belief is animated, in large part, by (1) the important role that PVABs play in the proxy voting process and the scope of the potential consequences should that role be disrupted, (2) the fact that the vast majority of PVABs' clients that expressed views on the Rule 14a–2(b)(9)(ii) conditions opposed them, and (3) our conclusion that the reliance interests implicated by rescinding those conditions are limited, as discussed above.

(Doc. No. 35-21 at 43,177; *see also id.* at 43,180.) Whether one characterizes that reasoning as involving the rejection of an "alternative policy" or not is beside the point. The SEC provided a reasoned explanation of why it did not wish to delay its rule, and that explanation fully suffices as a ground for rejecting the course of action endorsed by Commissioner Peirce. The court accordingly will grant the SEC summary judgment as to Count V.

## E. Failure to Treat Similarly Situated Parties Similarly (Count VI)

"A long line of precedent has established that an agency action is arbitrary when the agency offered insufficient reasons for treating similar situations differently." *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996) (collecting cases). The plaintiffs argue that

the SEC's 2022 rulemaking runs afoul of those precedents in two ways. First, they argue that the SEC has "single[d] out PVABs for preferential treatment from other regulated parties with respect to self-regulation." (Doc. No. 33 at 29.) Second, the plaintiffs argue that the SEC "ignore[d] shareholders' interest in transparency in direct contrast to the Commission's emphasis on transparency in other contexts." (*Id.* at 30.)

Neither argument has any merit, because the plaintiffs have not identified any way in which similarly situated parties have actually been treated differently. Rather, they have identified two extraordinarily abstract questions that come up in countless settings and that, unremarkably, are often answered differently in different circumstances. Nearly every regulatory decision involves making a choice between using government power to coerce the regulated parties or leaving those parties to their own devices. And nearly every regulation involving the exchange and/or production of information requires the relevant agency to favor more or less transparency. The fact that the SEC often favors transparency and oversight does not mean that it is locked into a policy of maximal transparency and maximal oversight every time it promulgates a rule. Such an approach would have no basis in caselaw, the text of the APA, or the text of the Exchange Act.

Moreover, the court notes that there is at least one way in which the 2022 approach arguably resulted in *more* equal treatment of some relevant actors. Some commenters complained that the notice-and-awareness condition "inappropriately privilege[d] the views of [the relevant company's] management" by granting them "unequal access to the proxy solicitation process." (Doc. No. 35-21 at 43,172.) The 2020 rules required PVABs to disclose their advice to management and pass management's response along to clients, but it granted no such rights to other stakeholders—despite the fact that, in many cases, many of those

stakeholders would also have a strong, legitimate interest in fact-checking PVAB advice and having any rebuttal they chose to make disseminated through the "awareness" half of notice-and-awareness. The SEC, however, gave non-management supporters or opponents of proposals no rights comparable to management.

The court does not point out the foregoing to suggest that the 2020 rules were arbitrary and capricious. Rather, the court merely hopes to highlight the fact that the 2020 rules, like the 2022 rescission, reflected an exercise of the SEC's right to treat differently situated actors differently based on its assessment of the context and policy implications involved. Just as that principle allowed the SEC to grant company management special privileges in connection with the PVAB process, it allowed the SEC to roll those privileges back. The court will therefore grant summary judgment to the defendants on Count VI.

## V. CONCLUSION

For the foregoing reasons, the plaintiffs' Motion for Summary Judgment (Doc. No. 32) will be denied, and the defendants' Cross-Motion for Summary Judgment (Doc. No. 57) will be granted.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge